John A. BOEHNER, Appellant,

v.

James A. McDERMOTT, Appellee.

United States of America, Intervenor for Appellant.

No. 98–7156.

United States Court of Appeals, District of Columbia Circuit.

Argued April 30, 1999.

Decided Sept. 24, 1999.

Michael A. Carvin argued the cause for appellant. With him on the briefs was R. Ted Cruz.

Scott R. McIntosh, Attorney, U.S. Department of Justice, argued the cause for intervenor United States. With him on the briefs were Frank W. Hunger, Assistant Attorney General at the time the briefs were filed, David W. Ogden, Acting Assistant Attorney General, William B. Schultz, Deputy Assistant Attorney General, and Douglas N. Letter, Litigation Counsel.

Frank Cicero, Jr., argued the cause for appellee. With him on the brief were Christopher Landau and Daryl Joseffer.

Theodore J. Boutrous, Jr., argued the cause for amici curiae The Washington Post Company, et al. With him on the brief were Seth M.M. Stodder, Mary Ann Werner, and Jane Kirtley.

Before: GINSBURG, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Opinion filed by Circuit Judge GINSBURG concurring in the judgment and in Parts I, II.B, and II.D (except the first and last paragraphs) of the opinion for the Court.

Dissenting opinion filed by Circuit Judge SENTELLE.

RANDOLPH, Circuit Judge:

"Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. A federal statute prohibits private parties from intentionally intercepting wire, oral and electronic communications. The law also forbids any person from disclosing the contents of such a communication, if the person knew it was illegally intercepted. Is it part of "the freedom of speech" for an individual to give a newspaper the tape recording of a cellular telephone call he received from the criminals who conducted the illegal eavesdropping? That is the ultimate question in this appeal from the district court's dismissal of a complaint brought against the individual who transferred the tape to the New York Times and other newspapers. The district court ruled that, as applied in this case, the federal prohibition on disclosure violated the First Amendment because the defendant "legally obtained" the tape recording, and because the tape contained conversations relating to matters of "public concern." The United States has intervened to defend the constitutionality of the statute.

I

John A. Boehner, a Republican member of the House of Representatives, representing the Eighth District of Ohio, brought this action against James A. McDermott, a Democratic member of the House representing the Seventh District of Washington. The following events are the focus of the complaint.[1]

1. Because this matter comes before the court as an appeal of the district court's grant of a motion to dismiss, we take as true the allegations made by Boehner in his complaint. *See Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1263 (D.C.Cir. 1995).

On December 21, 1996, Representative Boehner participated in a conference call with members of the Republican Party leadership, including Representatives Dick Armey and Tom DeLay, and then-Speaker of the House Newt Gingrich. At the time of the conversation, Gingrich was the subject of an investigation by the House Committee on Standards of Official Conduct—the House Ethics Committee. *See In the Matter of Representative Newt Gingrich*, H.R.REP. No. 105–1 (1997); *see also* H.R. 31, 105th Cong. (1997) (adopting the report). Boehner was chairman of the House Republican Conference. The participants discussed strategy regarding an expected Ethics Subcommittee announcement of Gingrich's agreement to accept a reprimand and to pay a fine in exchange for the committee's promise not to hold a hearing.

Boehner was driving through northern Florida when he joined the conference call. He spoke from a cellular telephone in his car. John and Alice Martin, who lived in Florida, used a radio scanner to eavesdrop on the conversation. They tape recorded the call and later met with Democratic Representative Karen Thurman of Florida to discuss both the tape and the possibility of their receiving immunity for their illegal interception of the call.

At Thurman's suggestion, the Martins personally delivered the tape to Representative McDermott on January 8, 1997. McDermott was then the ranking Democratic member of the House Ethics Committee. The Martins' cover letter explained that the tape contained "a conference call heard over a scanner," and closed with this statement: "We understand that we will be granted immunity."

The next day, January 9, 1997, McDermott gave copies of the tape to the New York Times, the Atlanta Journal–Constitution, and Roll Call. Because the tape revealed Gingrich engaging in conduct that might have violated the terms of the agreement, it had great news value for the three newspapers, and each ran a story on the party leaders' conversation. The New York Times published its story on the front page of its January 10, 1997 edition and included a verbatim transcript of a portion of the conversation.

After the newspaper accounts appeared, the Martins publicly confessed their role in recording the conversation and admitted giving a copy of their tape to McDermott. On January 13, 1997, McDermott provided his fellow Ethics Committee members with the Martins' tape (or a copy of it) and resigned from the committee. The committee chairman, Representative Nancy Johnson, forwarded the tape to the Justice Department. The government prosecuted the Martins for violating 18 U.S.C. §§ 2511(1)(a) and 2511(4)(b)(ii).

Under § 2511(1)(a), anyone who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" is guilty of an offense punishable by fine or imprisonment, or both. 18 U.S.C. §§ 2511(1)(a), 2511(4). The Martins entered guilty pleas on April 23, 1997, and were each fined $500.

One year later Boehner brought this suit against McDermott, invoking the civil liability provisions of the Electronic Communications Privacy Act. *See* 18 U.S.C. § 2520. His complaint charged McDermott with violating 18 U.S.C. § 2511(1)(c):

(1) Except as otherwise specifically provided in this chapter any person who—

\*      \*      \*

(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

\*      \*      \*

shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

Claiming that McDermott had illegally disclosed the contents of the conference call, knowing it to have been illegally intercepted, Boehner sought statutory damages of $10,000 pursuant to 18 U.S.C. § 2520(c)(2)(B).[2]

McDermott moved to dismiss the complaint, arguing that § 2511(1)(c), as applied to him, violated the free speech clause of the First Amendment. He claimed, and the district court agreed, that the First Amendment "prohibits the punishment under any of the statutes cited in the Complaint for the disclosure of truthful and lawfully obtained information on a matter of substantial public concern." Motion to Dismiss at 1.

## II

### A

In mounting his First Amendment defense, McDermott obviously thinks he engaged in speech, speech for which he would suffer liability in damages if § 2511(1)(c) were applied to him. What speech? A simple question, but crucial. Too bad McDermott devotes only one sentence of his brief to the answer: "Because the disclosure of information is unquestionably speech, these provisions [of federal and state law] impose a naked prohibition on speech." Brief for Appellee at 11. But those who expose private activity to public gaze are not necessarily engaging in speech, let alone "the freedom of speech." Otherwise, one might as well say the Martins were exercising their right of free speech when they personally handed over the product of their crime to McDermott; or that they would have been engaging in free speech if they had surreptitiously dropped the tape on his doorstep, or mailed it to him anonymously in a plain wrapper. Not even McDermott goes so far. See, e.g., Oral Arg. Tr. at 41, 43.[3] If the Martins were not exercising their right of free speech, as McDermott seems to concede, it is difficult to see why McDermott was exercising his freedom of speech when he gave copies of their tape to the newspapers.

At one point in his brief, McDermott asserts that "[t]his is core political speech, and lies at the very heart of the First Amendment." Brief for Appellee at 45. His assertion, however, deals with the contents of the tape. The tape does indeed contain speech about political matters. But the speech is not McDermott's and § 2511(1)(c) does not render him liable for anything anyone said on the recording. As to McDermott's speech, it is safe to assume that he said something when he arranged for delivery of the tapes to the newspapers. The New York Times in fact attributed several statements to him:[4] a

---

2. In a separate count, Boehner brought a claim under FLA. STAT. ANN. § 934.03(1)(c)—which, in relevant respects, is identical to 18 U.S.C. § 2511(1)(c). Because our analysis of the two statutes will be the same with respect to McDermott's First Amendment claim, whenever this opinion refers to the federal statute, we intend to include the state statute as well.

In his motion to dismiss, McDermott also argued that the Florida statute could not apply to his conduct because his alleged actions occurred outside the state's borders. Because the district court dismissed the complaint on other grounds, it did not address this argument. See Boehner v. McDermott, Civ. No. 98–594 (TFH), 1998 WL 436897, at *3 n. 2 (D.D.C. July 28, 1998).

3. At oral argument, McDermott conceded that, on the facts alleged in the complaint, his delivery of the tapes to the newspapers brought him within § 2511(1)(c)'s prohibition against anyone who "intentionally discloses, or endeavors to disclose" the contents of an illegally intercepted communication. Oral Arg. Tr. at 38–43. Whether in this case the actual disclosure ·occurred only after the newspaper took possession of the tape and played it is therefore of no moment.

4. We assume McDermott was the unnamed Congressman mentioned in the Times article. See Edmondson & Gallagher, 48 F.3d at 1263.

"Democratic Congressman hostile to Mr. Gingrich … insisted that he not be identified further"; the "Congressman said the tape had been given to him on Wednesday by a couple who said they were from northern Florida"; the Congressman "quoted them as saying it had been recorded off a radio scanner … about 9:45 A.M. on Dec. 21." In making these remarks McDermott was undoubtedly engaging in speech. But neither these statements, nor any other statements he may have made to the newspapers in connection with his delivery of the tape, are the basis of the complaint. McDermott's liability under § 2511(1)(c) rests on the truth of two allegations: that he "caused a copy of the tape" to be given to the newspapers; and that he "did so intentionally and with knowledge and reason to know that the recorded phone conversation had been illegally intercepted (as the cover letter on its face disclosed)." Complaint ¶ 20. Although the circumstances of McDermott's transactions with the newspapers, including who said what to whom, may become evidence at trial, it is his conduct in delivering the tape that gives rise to his potential liability under § 2511(1)(c). McDermott's behavior in turning over the tapes doubtless conveyed a message, expressing something about him. All behavior does. But not all behavior comes within the First Amendment.

"[E]ven on the assumption that there was [some] communicative element in" McDermott's conduct, the Supreme Court has held that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The *O'Brien* framework is the proper mode of First Amendment analysis in this case. McDermott's challenge is only to the statute as it applies to his delivery of the tape to newspapers. Whether a different analysis would govern if, for instance, McDermott violated § 2511(1)(c) by reading a transcript of the tape in a news conference, is therefore a question not presented here. Nor should we be concerned with whether § 2511(1)(c) would be constitutional as applied to the newspapers who published the initial stories about the illegally-intercepted conference call. The focus must be on McDermott's activity and on his activity alone. *See Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *United States v. Raines,* 362 U.S. 17, 21–22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); *contrast Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

**B**

In its modern iteration, the *O'Brien* analysis applies to statutes containing generally applicable, content-neutral prohibitions on conduct that create incidental burdens on speech. *See Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 642, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994); *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Section 2511(1)(c) is a statute fitting that description. It is one of several provisions constituting "a comprehensive statutory scheme dedicated to preserving personal privacy by sharply limiting the circumstances under which surveillance may be undertaken and its fruits disclosed." *Lam Lek Chong v. DEA,* 929 F.2d 729, 733 (D.C.Cir.1991). It prohibits the disclosure of all illegally intercepted communications, without regard to the substance of the communication or the identity of the person who does the disclosing. It reveals no governmental interest in distinguishing between types of speech based on content. It neither favors nor disfavors any particular viewpoint. To the extent that the particular type of con-

duct § 2511(1)(c) addresses—"disclosure"—may entail constitutionally protected speech, the statute regulates it without reference to content. *See Lam Lek Chong,* 929 F.2d at 733; *see also Turner Broad.,* 512 U.S. at 642–43, 114 S.Ct. 2445; *R.A.V. v. St. Paul,* 505 U.S. 377, 386, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Time Warner Entertainment Co. v. FCC,* 93 F.3d 957, 969 (D.C.Cir.1996) (per curiam).

The oft-repeated test laid down in *O'Brien* is as follows:

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 377, 88 S.Ct. 1673.

Here, the "substantial governmental interest" "unrelated to the suppression of free expression" is evident. Section 2511(1)(c), rather than impinging on speech, as McDermott supposes, promotes the freedom of speech. Eavesdroppers destroy the privacy of conversations. The greater the threat of intrusion, the greater the inhibition on candid exchanges. Interception itself is damaging enough. But the damage to free speech is all the more severe when illegally intercepted communications may be distributed with impunity.[5] This is why § 2511 does not merely prohibit the unauthorized interception of wire, oral and electronic communications. It is why the federal statute also forbids the use and disclosure of the illegally intercepted communication.[6] It is why, in cer-

---

5. *See Gelbard v. United States,* 408 U.S. 41, 52, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972): "to compel the testimony of these witnesses compounds the statutorily proscribed invasion of their privacy by adding to the injury of the interception the insult of compelled disclosure. And, of course, Title III makes illegal not only unauthorized interceptions, but also the disclosure and use of information obtained through such interceptions. 18 U.S.C. § 2511(1); *see* 18 U.S.C. § 2520."

6. In addition to Florida, forty-four other states and the District of Columbia prohibit not only the interception of electronic communications, but also the disclosure of those communications by persons not acting under color of law. Most of these statutes mirror the wording of 18 U.S.C. § 2511. *See* ALA. CODE §§ 13A–11–31,13A–11–35 (1994); ALASKA STAT. §§ 42.20.300 to 42.20.330 (Michie 1989 & Supp.1995); ARIZ.REV.STAT. ANN. §§ 13–3005, 13–3006 (West 1989) (limiting criminal disclosure liability to telecommunications employees and those acting in concert with them); CAL.PENAL CODE §§ 631, 632 (West 1999); COLO. REV. STAT. § 18–9–303 (1986 & Supp.1995); CONN. GEN. STAT. §§ 53a–187, 53a–188, 53a–189, 54–41r (1994) (allowing civil recovery from any unauthorized discloser, but limiting criminal penalties to telecommunications employees and those acting in concert with them); DEL.CODE ANN. tit. 11, § 1336 (1996); D.C.CODE ANN. §§ 23–542, 23–554 (1996); GA.CODE ANN. §§ 16–11–62, 16–11–66.1 (1994); HAW. REV. STAT. § 803–42 (1995); IDAHO CODE § 18–6702 (1996); 720 ILL. COMP. STAT. ANN. 5/14–2 (1993); IND.CODE ANN. § 35–45–2–4 (West 1994) (limiting criminal disclosure liability to telecommunications employees); IOWA CODE §§ 808B.2, 808B.8 (1994), *as amended by* Act of Apr. 28, 1999, 1999 Iowa Legis. Serv. S.F. 309 (West); KAN. STAT. ANN. § 21–4002 (1996); KY.REV.STAT. ANN. §§ 526.020, 526.060 (Michie 1998); LA.REV. STAT. ANN. §§ 15:1303, 15:1312 (West 1992); ME.REV.STAT. ANN. tit. 15, §§ 710, 711 (West 1998); MD.CODE ANN., CTS & JUD. PROC. § 10–402 (1998); MASS. GEN. LAWS ANN. ch. 272, § 99(c) (West 1990); MICH. COMP. LAWS ANN. §§ 750.539c, 750.539e, 750.539h (West 1991 & Supp. 1995); MINN.STAT. ANN. §§ 626A.02, 626A.13 (West 1998); MO. REV. STAT. §§ 542.402, 542.418 (1996); MONT.CODE ANN. § 45–8–10 (1997); NEB. REV. STAT. §§ 86–702, 86–707.02 (1995); NEV.REV.STAT. §§ 200.620, 200.630, 200.650, 200.690 (1994); N.H.REV. STAT. ANN. § 570–A:2 (1995); N.J. STAT. ANN. §§ 2A–156A–3, 2A–156A–24 (West 1985 & Supp.1999); N.M. STAT. ANN. §§ 30–12–14, 30–12–11 (Michie 1994); N.Y. PENAL LAW §§ 250.05, 250.25 (McKinney 1989 & Supp. 1995); N.C. GEN. STAT. § 15A–287 (1996); N.D. CENT CODE § 12.1–15–02 (1994); OHIO REV.CODE ANN. §§ 2933.52, 2933.65 (Banks-Baldwin 1998) (prohibiting interception and use, authorizing civil damages for interception, disclosure, and use); OKLA. STAT. ANN. tit. 13, §§ 176.2 to 176.5 (West 1994); OR.REV. STAT. §§ 165.540, 165.543 (1998); 18 PA CONS STAT. ANN. §§ 5703, 5725 (West 1999); R.I. GEN. LAWS § 11–35–21 (1998); TENN.CODE ANN. §§ 39–13–601 to 39–13–603 (1994); TEX. PE-

tain circumstances, the law also punishes disclosure even if the interception was itself legal, as when a law enforcement official has conducted a wiretap pursuant to a court order. *See* 18 U.S.C. § 2511(1)(e).

■ In all of this it is well to remember that although the "essential thrust of the First Amendment is to prohibit improper restraints on the *voluntary* public expression of ideas," there is "a concomitant freedom *not* to speak publicly, which serves the same ultimate end as freedom of speech in its affirmative aspect." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 559, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (quoting with approval *Estate of Hemingway v. Random House, Inc.*, 23 N.Y.2d 341, 296 N.Y.S.2d 771, 244 N.E.2d 250, 255 (1968)); *see also Halperin v. Kissinger*, 606 F.2d 1192, 1199 (D.C.Cir. 1979), *aff'd*, 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981) (per curiam). The freedom not to speak publicly, to speak only privately, is violated whenever an illegally intercepted conversation is revealed, and it is violated even if the person who does the revealing is not the person who did the intercepting.[7] For his part, McDermott correctly concedes that the Martins could have been punished not only for intercepting the conference call, but also for giving the tape to him. *See* Oral Arg. Tr. at 41, 43, 53. But as we have indicated, he offers no good explanation why, if he had a First Amendment right to disclose the call, the Martins did not. Comparing the Martins' conduct with McDermott's, one might rank the Martins as more culpable. Yet in terms of damage to the privacy of conversations and to the freedom of speech, McDermott's alleged actions had a far more devastating impact.

There are other substantial government interests underlying § 2511(1)(c), interests best illustrated through a hypothetical. Suppose Boehner had tape recorded his conference call.[8] Suppose as well that the Martins later break into Boehner's office, steal the tape and give it to McDermott, who then acts exactly as he is alleged to have acted here: he accepts the tape from the Martins and delivers it to the press. In the hypothetical, there is no doubt that if McDermott knew how the Martins acquired the tape, he could be prosecuted for receiving stolen property. *See* D.C. CODE ANN. § 22–3832. With respect to McDermott, it is hard to see any practical constitutional distinction between the hypothetical and the facts alleged here. In the one case the Martins steal the tape; in the other, they illegally "seize" the conversation. *See Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In both instances, McDermott knows of the illegality. The contents of both tapes are identical; what McDermott does with the tape is the same; and in both cases McDermott knows the Martins are giving him something they acquired illegally. Receiving stolen property is punished in order to remove the incentive to steal, to dry up the market for stolen goods. *See*

nal Code Ann. §§ 16.02, 16.05 (WEST 1994); Utah Code Ann. §§ 77–23A–4, 77–23A–11 (1994); Va.Code Ann. §§ 19.2–62, 19.2–69 (MICHIE 1990); W.Va.Code §§ 62–1D–3, 62–1D–12 (1990); Wis.Stat. Ann. § 968.31 (WEST 1985 & SUPP.1999); Wyo. Stat. §§ 7–3–602, 7–3–609 (1987); *SEE ALSO* RUSSELL G. DONALDSON, ANNOTATION, *CONSTRUCTION AND APPLICATION OF STATE STATUTES AUTHORIZING CIVIL CAUSE OF ACTION BY PERSON WHOSE WIRE OR ORAL COMMUNICATION IS INTERCEPTED, DISCLOSED, OR USED IN VIOLATION OF STATUTES*, 33 A.L.R.4TH 506, 1984 WL 263258 (1998). ARKANSAS DOES NOT SEPARATELY PROHIBIT THE DISCLOSURE OF INTERCEPTED COMMUNICATIONS, BUT ITS LAWS ACHIEVE A SIMILAR EFFECT BY MAKING

IT A CRIME "TO RECORD OR POSSESS A RECORDING OF SUCH COMMUNICATION." Ark.Code Ann. § 5–60–120(A) (MICHIE 1994).

7. The link between the Martins and McDermott was direct. Whether someone further down the chain would have a defense similar to that suggested by *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939)—that the taint of illegality was sufficiently dissipated—is something we do not decide.

8. Federal law does not prohibit someone who is a party to a conversation from taping it. *See* 18 U.S.C. § 2511(2)(d).

Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law § 93, at 692 (1972). For a similar reason—that is, "to dry up the market"—states have made distribution and possession of child pornography criminal offenses. *Osborne v. Ohio*, 495 U.S. 103, 110, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990); *New York v. Ferber*, 458 U.S. 747, 760, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). And for the same reason Congress has forbidden the disclosure of the contents of illegally intercepted communications. The district court was quite right in thinking that without § 2511(1)(c)'s prohibition on disclosure, the government would have "no means to prevent the disclosure of private information, because criminals like the Martins can literally launder illegally intercepted information" and there would be "almost no force to deter exposure of any intercepted secret." *Boehner v. McDermott*, Civ. No. 98–594 (TFH), 1998 WL 436897, at *4 (D.D.C. July 28, 1998).

What we have just written also explains why whatever incidental restriction on speech § 2511(1)(c) imposes, it is "no greater than is essential to the furtherance of that interest"—the final consideration in the *O'Brien* formulation. 391 U.S. at 377, 88 S.Ct. 1673. Unless disclosure is prohibited, there will be an incentive for illegal interceptions; and unless disclosure is prohibited, the damage caused by an illegal interception will be compounded. It is not enough to prohibit disclosure only by those who conduct the unlawful eavesdropping. One would not expect them to reveal publicly the contents of the communication; if they did so they would risk incriminating themselves. It was therefore "essential" for Congress to impose upon third parties, that is, upon those not responsible for the interception, a duty of nondisclosure.

## C

As against the foregoing analysis, McDermott maintains that he "lawfully obtained" the tape recording from the Martins because he committed no offense in accepting it; that the tape contained truthful information of public concern; and that the First Amendment therefore prohibits holding him liable for handing the tape (or copies of it) over to the newspapers.[9] He believes the following "limited First Amendment principle" controls: "If a newspaper lawfully obtains truthful information about a matter of public significance, then [the government] may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Florida Star v. B.J.F.*, 491 U.S. 524, 533, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989), quoting *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979).[10]

The district court, believing that *Florida Star* left it no other choice, reluctantly

---

9. It appears that McDermott, or someone acting for him, made copies of the tape. No one disputes that the Martins gave but one copy of the tape to McDermott. The New York Times, in its article of January 10, 1997, reported that it had received a tape recording of the conference call from a "Democratic Congressman" who did not wish to be identified. The complaint alleges that McDermott also gave audiotapes to two other newspapers. After the Martins held a press conference on January 13, 1997, McDermott delivered still another copy of the tape to the House Ethics Committee, which turned the tape over to the Justice Department. McDermott may also have made a transcript of the call. According to the New York Times, in its article of January 10, 1997, "a transcript of [the conference call] was made available by" the same unidentified Congressman who supplied the tape.

10. The quotation does not fit precisely. The case before us is a civil suit for damages, not a criminal prosecution to impose punishment. Boehner makes nothing of this distinction and neither will we. *See Cohen v. Cowles Media Co.*, 501 U.S. 663, 670, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991). Also, the complaint alleges that McDermott disclosed the conversation, not that he published it. Publication of course will always amount to a disclosure, but not every disclosure may amount to the sort of publication the Supreme Court had in mind.

adopted McDermott's line of reasoning. Reluctantly because the court thought these decisions had forced it into an "illogical" interpretation of the First Amendment. *Boehner*, 1998 WL 436897, at *4. McDermott's theory was, the court thought, "a slippery one, as it not only defends, but even encourages, the circumnavigation of wiretap statutes, which are designed to prevent the disclosure of private conversations." *Id.* at *3. By accepting this theory, the district court had rendered the government powerless "to prevent disclosure of private information, because criminals like the Martins can literally launder illegally intercepted information." *Id.*

There are many reasons for disagreeing with McDermott and with the district court about the significance of *Florida Star* as applied to this case. But first the facts of *Florida Star*. A Florida statute made it unlawful to publish the name of a rape victim "in any instrument of mass communication." 491 U.S. at 526 n. 1, 109 S.Ct. 2603. The Sheriff's Department in Duval County, Florida, mistakenly included a rape victim's name in its publicly available police blotter. A Florida Star reporter took down the victim's name, and the newspaper published it. The victim sued the Sheriff's Department and the newspaper for violating the statute. Before trial, the Sheriff's Department settled with the plaintiff. A jury awarded damages against the Florida Star and a state appellate court affirmed.

The Supreme Court sustained the newspaper's First Amendment attack on the statute. The Court believed the newspaper had "lawfully obtained" the rape victim's name because the government—in the form of the Sheriff's Department—had made this information available. *See id.* at 534–36, 109 S.Ct. 2603. The Court then explained why there was no "need" for the state to forbid the mass media from publishing the victim's name. The government had provided the information to the media and thus could more effectively have "policed itself" to prevent dissemination of the information. *Id.* at 538, 109 S.Ct. 2603. The statute contained no scienter requirement; and the press was entitled to assume the government "considered dissemination lawful," *id.* at 539, 109 S.Ct. 2603, because the information stemmed from a "government news release," *id.* at 538, 109 S.Ct. 2603. And last, the statute was under–inclusive, prohibiting publication only in "instruments of mass communication," while not prohibiting revelation of the victim's identity through other means. *Id.* at 540, 109 S.Ct. 2603.

A comparison of *Florida Star* with this case reveals far more significant differences than similarities. And it is critical to recognize each of those differences. The Supreme Court did not intend to declare a universal First Amendment principle in *Florida Star*. The several phrases McDermott has fastened upon are tempered, not only by other language in the opinion, but also by the context in which they were written. Throughout, the Court stresses that it meant its decision to be narrow. The state of the law in this area is "somewhat uncharted," *id.* at 531 n. 5, 109 S.Ct. 2603; the "future may bring scenarios which prudence counsels our not resolving anticipatorily," *id.* at 532, 109 S.Ct. 2603; the Court is following the practice of resolving "this conflict only as it arose in a discrete factual context," *id.* at 531, 109 S.Ct. 2603; "[o]ur holding today is limited," *id.* at 541, 109 S.Ct. 2603.

Let us now compare the statute in *Florida Star* with § 2511(1)(c). One could say, as McDermott seems to, that both provisions are alike in that both prohibit the "disclosure" of "information." But when we dig more deeply many critical differences appear. To ignore them would be to convert *Florida Star* from a narrow decision into an expansive one. Consider first exactly what the statutes forbid. The Florida statute prohibited the act of printing, publishing or broadcasting "in any instrument of mass communication." 491 U.S. at 526 n. 1, 109 S.Ct. 2603 (quoting

FLA. STAT. § 794.03 (1987)). The federal law is not, however, limited to those means of disclosure and it is not aimed at the press. Anyone who discloses, or endeavors to disclose, illegally intercepted communications knowing of the illegality violates § 2511(1)(c). The objectives of the laws are different too. The Florida statute sought to protect the privacy of rape victims. *See* 491 U.S. at 537, 109 S.Ct. 2603. The federal law seeks to protect the privacy of communications. *See, e.g., Gelbard v. United States,* 408 U.S. 41, 51–52, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972). In that respect, the federal law—unlike the Florida statute—advances First Amendment interests for reasons already mentioned. *See supra* pp. 468–70. The Florida statute dealt with information in the government's possession; release of the information was therefore in the government's control. *See* 491 U.S. at 534–36, 538–39, 109 S.Ct. 2603. The federal law deals with communications between private persons, the content of which will not be known to the government, unless it has complied with the rigorous procedures needed to obtain a court order allowing electronic surveillance for law enforcement purposes. *See* 18 U.S.C. § 2518; *see also id.* §§ 2511(2)(b)-(f), 2515–2517, 2519. The state law in *Florida Star* (and in *Daily Mail*) "defined the content of publications that would trigger liability." *Cohen v. Cowles Media Co.,* 501 U.S. 663, 670–71, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991). Here, the federal prohibition on disclosure is not dependent on the content of the communication. And of greatest importance, § 2511(1)(c) prohibits disclosure of the communication only if the original interception was itself illegal and only if the person charged with unlawfully disclosing its contents knew of the illegality. *See* 18 U.S.C. § 2511(1)(c). In contrast, the Florida statute had no scienter requirement, *see Florida Star,* 491 U.S. at 539, 109 S.Ct. 2603, and the government lawfully acquired the information—the victim's identity—while investigating a crime.

This last distinction must be underscored because the Supreme Court in *Florida Star* attached such great significance to it. After citing cases for the proposition that when "information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts," the Court dropped a footnote:

> The *Daily Mail* principle does not settle the issue whether, in cases where information has been acquired unlawfully by a newspaper or by a source, government may ever punish not only the unlawful acquisition, but the ensuing publication as well. This issue was raised but not definitively resolved in *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), and reserved in *Landmark Communications,* 435 U.S. [829,] 837, 98 S.Ct. 1535, 56 L.Ed.2d 1 [ (1978) ]. We have no occasion to address it here.

491 U.S. at 535 n. 8, 109 S.Ct. 2603.

To understand this footnote correctly one must remember that in the newspaper business, sources provide information, but newspapers, not sources, are the publishers. Suppose a "source" breaks into an office, steals documents, gives them to a newspaper and the newspaper, knowing the documents were stolen, publishes them in violation of a state or federal law. We read footnote 8 to mean that the "*Daily Mail* principle" would not determine if the newspaper had a First Amendment right to publish the stolen documents. What takes this hypothetical case out of *Daily Mail* and *Florida Star*? The fact that the documents are the product of a crime, committed by a "source." McDermott thinks he stands in the shoes of the "newspaper" in *Florida Star*. He treats a newspaper's "publication" as the equivalent of his disclosure. Given his press analogy, the Martins played the role of McDermott's "source." It follows from footnote 8 that the "*Daily Mail* principle" and the

decision in *Florida Star* do not "settle" this case.

McDermott's effort to explain away the *Florida Star* footnote is thoroughly unconvincing. He proposes that footnote 8 "simply reserved the question whether a person who discloses unlawfully acquired information is subject to punishment *only* for the unlawful acquisition or for *both* the unlawful acquisition and the disclosure." Brief for Appellee at 31. In other words, all the Court left open is the question whether the Martins could have been punished not only for intercepting the call, in violation of § 2511(1)(a), but also for giving the tape to McDermott, in violation of § 2511(1)(c). This cannot be correct. For one thing, the Court did not have before it a case in which the published information—the rape victim's name—had been "acquired unlawfully ... by a source"; the Sheriff's Department was the newspaper's "source" and it acquired the victim's name both lawfully and with her consent. Also, given the facts of *Florida Star*, and particularly in light of the Court's resolve to confine the opinion to the "discrete factual context" of the case, 491 U.S. at 531, 109 S.Ct. 2603, the Court necessarily did not decide the question before us. For another thing, McDermott's reading of the footnote could make sense if and only if a "source" first illegally obtained information and then did the "ensuing publication." In the context of the footnote, this is farfetched indeed. Again, the newspapers' sources do not publish; the newspapers do. The point of the footnote is that regardless whether the illegality is committed by a newspaper's reporter or by a source, if the newspaper publishes the illegally obtained information, the First Amendment may not shield it from punishment. The Court came close to holding as much in *Branzburg v. Hayes*, 408 U.S. 665, 691–92, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972): no matter how great "the interest in securing the news," the First Amendment "does not reach so far as to override the interest of the public in ensuring that neither reporter nor source is invading the rights of other citizens through reprehensible conduct forbidden to other persons."

Furthermore, if McDermott were right about the footnote, there is no explaining the Court's citation to the "Pentagon Papers" case—*New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). At the time of that decision, everyone knew that a "source" (later identified as Daniel Ellsberg, a researcher at the RAND Corporation on contract with the Department of Defense) had illegally obtained copies of classified Defense Department documents. *See generally* DAVID RUDENSTINE, THE DAY THE PRESSES STOPPED: A HISTORY OF THE PENTAGON PAPERS CASE 33–65 (1996).[11] The issue before the Court was whether enjoining the New York Times and the Washington Post from publishing the material amounted to a prior restraint in violation of the First Amendment. As the *Florida Star* footnote stated, the Court left unresolved the question whether the Post and the Times could be punished for later publishing the documents Ellsberg had illegally acquired.[12] In short, McDermott's reading of footnote 8 in *Florida Star* is flatly contradicted by the Court's citation to the

---

**11.** The United States later prosecuted Ellsberg for violating the Federal Espionage Act and for theft of government property. *See generally* RUDENSTINE, *supra*, at 341–43. The district judge barred the prosecution after the government revealed that the "White House plumbers" had burglarized Ellsberg's psychiatrists' office and intercepted telephone conversations, in violation of the Constitution. *See id.*; *see also Russo v. Byrne*, 409 U.S. 1219, 93 S.Ct. 21, 34 L.Ed.2d 30 (1972) (Douglas, Circuit J.) (issuing a stay against Ellsberg's prosecution); *United States v. Russo & Ellsberg*, Crim. No. 9373 (WNB) (C.D. Cal. May 11, 1973) (dismissing the prosecution because of government misconduct). Ellsberg and others later sought civil damages from the interceptors under the same provision Boehner now invokes against McDermott. *See, e.g., Ellsberg v. Mitchell*, 807 F.2d 204 (D.C.Cir.1986); *Smith v. Nixon*, 807 F.2d 197 (D.C.Cir.1986); *Halperin v. Kissinger*, 807 F.2d 180 (D.C.Cir.1986).

**12.** Justice White, joined by Justice Stewart, put it this way in his concurring opinion:
 The Criminal Code contains numerous provisions potentially relevant to these

Pentagon Papers case, by the Court's distinction between a source and a newspaper, and by the Court's expressed intent to confine its *Florida Star* opinion strictly to the facts of the case. Given footnote 8, McDermott is not correct in arguing that the First Amendment precludes punishing an individual for disclosing information illegally transmitted to him, so long as the individual violated no law in receiving the information. Brief for Appellee at 30.[13]

McDermott also misreads *Landmark Communications, Inc. v. Virginia*, 435

U.S. 829, 837, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), which the *Florida Star* footnote also cited. In that case a newspaper was indicted for publishing an article about a pending investigation of a state judge.[14] McDermott is right in describing what *Landmark* did not decide. The Court wrote: "We are not here concerned with the possible applicability of the statute to one who secures the information by illegal means and thereafter divulges it." *Id.* But McDermott is wrong in describing what *Landmark* did decide. The Court did not, as he contends, determine that a

---

cases.... If any of the material here at issue is of [the kind described in 18 U.S.C. § 797 or § 798], the newspapers are presumably now on full notice of the position of the United States and must face the consequences if they publish. I would have no difficulty in sustaining convictions under these sections on facts that would not justify the intervention of equity and the imposition of a prior restraint.

403 U.S. at 735–37, 91 S.Ct. 2140 (White, J., concurring) (footnotes omitted); *see also id.* at 730, 91 S.Ct. 2140 (Stewart, J., joined by White, J., concurring) (noting that "several [criminal laws] are of very colorable relevance to the apparent circumstances in these cases" and acknowledging the possibility of future criminal or civil proceedings); *id.* at 744–45, 91 S.Ct. 2140 (Marshall, J., concurring) (noting that "equity will not enjoin the commission of a crime" and identifying two statutes under which "a good-faith prosecution could have been instituted"); *id.* at 752, 91 S.Ct. 2140 (Burger, C.J., dissenting) (expressly agreeing with Justice White's comments concerning "penal sanctions"); *id.* at 759, 91 S.Ct. 2140 (Blackmun, J., dissenting) (expressing "substantial accord" with Justice White's comments concerning criminal sanctions). In dissent, Justice Harlan, joined by Chief Justice Burger and Justice Blackmun, listed among "questions [which] should have been faced"—"Whether the newspapers are entitled to retain and use the documents notwithstanding the seemingly uncontested facts that the documents, or the originals of which they are duplicates, were purloined from the Government's possession and that the newspapers received them with knowledge that they had been feloniously acquired." *Id.* at 753–54 (Harlan, J., dissenting) (citing *Liberty Lobby, Inc. v. Pearson*, 390 F.2d 489 (D.C.Cir. 1967, amended 1968) (holding that plaintiffs were not entitled to a preliminary injunction)).

13. McDermott also relies on the following passage in *Florida Star*:

[U]nder Florida law, police reports which reveal the identity of the victim of a sexual offense are not among the matters of "public record" which the public, by law, is entitled to inspect.... But the fact that state officials are not required to disclose such reports does not make it unlawful for a newspaper to receive them when furnished by the government. Nor does the fact that the Department apparently failed to fulfill its obligation under [the Florida statute] not to "cause or allow to be ... published" the name of a sexual offense victim make the newspaper's ensuing receipt of this information unlawful. Even assuming the Constitution permitted a State to proscribe receipt of information, Florida has not taken this step.

491 U.S. at 536, 109 S.Ct. 2603. It appears to us that the Court intended to confine these remarks to information "furnished by the government." *Id.* The quoted passage follows the Court's point, made in the previous paragraph, that "depriving protection to those who rely on the government's implied representations of the lawfulness of dissemination, would force upon the media the onerous obligation of sifting through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication." *Id.*

14. The Virginia Constitution commanded that proceedings before the state Judicial Inquiry and Review Commission "shall be confidential." VA. CONST. art. 6, § 10. The statutes implementing this provision made it a misdemeanor for "any person" to "divulge information" about those proceedings, VA.CODE §§ 2.1–37.11, 2.1–37.12 (1973), which Virginia's highest court construed to include newspaper publication. *See Landmark*, 435 U.S. at 837 n. 9, 98 S.Ct. 1535.

newspaper has a First Amendment right to publish illegally acquired information. The record in *Landmark* contained no evidence regarding who supplied the newspaper with the information or how they obtained it. *See Landmark Communications, Inc. v. Commonwealth*, 217 Va. 699, 233 S.E.2d 120, 123 n. 4 (1977) ("The record is silent, however, concerning the manner in which Landmark secured the information."). The Court therefore decided only that "the Commonwealth's interests advanced by the imposition of criminal sanctions [were] insufficient to justify the actual and potential encroachments on freedom of speech and of the press which follow therefrom." *Landmark*, 435 U.S. at 838, 98 S.Ct. 1535.[15]

Footnote 8 of *Florida Star*, and the marked contrast between § 2511(1)(c) and the Florida rape victim statute, are enough to indicate that *Florida Star* cannot control this case. But this discussion should not end without mention of an additional basis for rejecting the district court's analysis. The Supreme Court said in *Florida Star* that its application of the *Daily Mail* principle rested on three considerations. Not one of them is present here.

The Court first pointed out that "when information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts." 491 U.S. at 534, 109 S.Ct. 2603. In this case, the content of the conference call was not information "entrusted to the government." It was instead—in the Supreme Court's words—

"sensitive information" in "private hands" and, therefore, if the government forbids "its nonconsensual acquisition," as it has in § 2511(1)(a), "the publication of any information so acquired" is "outside the *Daily Mail* principle." *Id.* "The right to speak and publish does not," in other words, "carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965).

"A second consideration undergirding the *Daily Mail* principle is the fact that punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act." *Id.* at 535, 99 S.Ct. 2667.[16] That consideration too is absent here. The conference call was not "already publicly available" when McDermott gave the tape to the newspapers. Apart from the participants (and those they informed), the contents of the call were then known only to a select few, including the Martins and McDermott. And they—the Martins *and* McDermott—gained their knowledge of the call only through illegal transactions.

"And" is emphasized in the last sentence because throughout this litigation, McDermott has attempted to portray himself as an innocent. Again and again he insists that he "lawfully obtained" the tape recording from the Martins. By this he means that he broke no law in taking possession of the tape. But this is hardly certain. The Martins violated § 2511 not once, but twice—first when they intercepted the call and second when they disclosed

15. The Court flatly rejected the argument that "truthful reporting about public officials in connection with their public duties is always insulated from the imposition of criminal sanctions by the First Amendment." *Id.*

16. The *Florida Star* Court described the *Daily Mail* formulation as a "synthesis of prior cases involving attempts to punish truthful publication." 491 U.S. at 533, 109 S.Ct. 2603. In two of those cases—*Oklahoma Publishing Co. v. Oklahoma County District Court*, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977), and *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975)—the published information had, like the information in *Florida Star*, been placed in the public domain by the government. In *Daily Mail*, the newspapers had "obtained [the information] from witnesses, the police, and a local prosecutor," 491 U.S. at 531, 109 S.Ct. 2603, and the state sought to punish the printing of the information after it had already been broadcast on the radio. *See Daily Mail*, 443 U.S. at 104–05, 99 S.Ct. 2667.

it to McDermott. By accepting the tape from the Martins, McDermott participated in their illegal conduct. That transaction may have involved a *quid pro quo*. When they transmitted the tape to McDermott, the Martins expressed their understanding that they would be receiving immunity for their illegal conduct. The inference is that someone promised this in return for the tape. Who? The obvious candidate is McDermott, or someone acting in concert with him. One need not go so far as to say that the Martins and McDermott entered into a conspiracy, in violation of 18 U.S.C. § 371. It is enough to point out, as Boehner does, that in receiving the tape, McDermott took part in an illegal transaction. *See* Reply Brief for Appellant at 11. If he did not thereby break the law, he was at least skirting the edge.

The *Florida Star* Court's third reason for applying the *"Daily Mail* principle" was "the 'timidity and self-censorship' which may result from allowing the media to be punished for publishing" "information released, without qualification, by the government." 491 U.S. at 535–36, 109 S.Ct. 2603. McDermott is not the "media"; the government did not release this information; and it would not be out of "timidity [or] self-censorship" for someone to alert the authorities after being handed evidence of a crime by those who perpetrated the offense. It would instead be an act worthy of a responsible citizen. *See* 18 U.S.C. § 3 (accessory after the fact); 18 U.S.C. § 4 (misprision of a felony).

In short, the illegal activity of the Martins, of which McDermott was well aware when he took possession of the tape, takes McDermott's actions "outside of the *Daily Mail* principle" and the *Florida Star* line of cases. 491 U.S. at 534, 109 S.Ct. 2603.[17]

Beyond those cases, one can find no firm First Amendment right to disclose information simply because the information was, in the first instance, legally acquired by the person who revealed it. For instance, a grand juror who lawfully obtains knowledge of the testimony of witnesses may not disclose that testimony to anyone else. *See* FED.R.CRIM.P. 6(e); *see In re Motions of Dow Jones & Co.*, 142 F.3d 496, 499–500 (D.C.Cir.1998). There appears to be no constitutional difficulty with laws prohibiting the disclosure of lawfully obtained trade secrets or with laws protecting proprietary interests in performances. *See Zacchini v. Scripps–Howard Broad. Co.*, 433 U.S. 562, 577–79 & n. 13, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). Congress may provide remedies for the unauthorized publication of copyrighted material even if the publisher broke no law in receiving the material. *See Harper & Row*, 471 U.S. at 555–60, 105 S.Ct. 2218. In discovery, litigants lawfully acquire private information from their opponents. This does not mean the First Amendment precludes a court from issuing a protective order to prevent disclosure of that information. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 31, 36–37, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). Courts may enforce a reporter's promise not to publish the lawfully obtained name of a confidential informant. *See Cohen*, 501 U.S. at 669–72, 111 S.Ct. 2513; *see also Snepp v. United States*, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam) (enforcing CIA agent's employment agreement to submit his writings for prepublication review). And a law enforcement official who conducts a wiretap or a judge who authorizes the interception has no First Amendment right to disclose the contents of the intercepted call

---

17. *Butterworth v. Smith*, 494 U.S. 624, 110 S.Ct. 1376, 108 L.Ed.2d 572 (1990), on which McDermott also relies, held that under the First Amendment the government could not prohibit a grand jury witness from publicly disclosing his own grand jury testimony. The Court did not suggest that grand jurors, who are under a duty of confidentiality, or some-

one who steals grand jury transcripts, could not be punished for disclosing such testimony. While *Butterworth* might apply if the law prohibited a person not only from tape recording his own conversation, but also from disclosing the contents of his conversation, the opinion had nothing to say about McDermott's situation.

or the existence of the electronic surveillance. *United States v. Aguilar*, 515 U.S. 593, 605, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995).[18]

One might try to distinguish these cases on the basis that in each there was some pre-existing duty not to reveal the information lawfully received. McDermott makes the attempt. In each of these cases, he says, "a person or entity obtains confidential information pursuant to a concomitant duty of nondisclosure, and the First Amendment does not preclude the enforcement of that duty." Brief for Appellee at 20. But this is no distinction at all. McDermott too obtained the tape under a duty of nondisclosure. In his case the duty arose from a statute— § 2511(1)(c). The same was true in *Harper & Row*, the only difference being that the duty there stemmed from the copyright laws. It is true that Congressional authority to pass copyright laws is provided specifically in the Constitution (Article I, § 8) and that copyright itself serves as an "engine of free expression." *Harper & Row*, 471 U.S. at 558, 105 S.Ct. 2218. But much the same may be said of § 2511: the Commerce Clause of the Constitution gave Congress the power to regulate interstate communications, and § 2511, including § 2511(1)(c), promotes free expression.

**D**

■ Our dissenting colleague finds it difficult to draw any lines between McDermott's disclosure of the tape and a newspaper's publication of the contents of the illegally acquired conversation. One line, clearly drawn in this case, is the line between conduct and speech. When a newspaper publishes, it engages in speech. In each of the cases our colleague discusses— in *Cox Broadcasting*, in *Oklahoma Publishing*, in *Daily Mail*, and in *Florida Star*[19]—there was no doubt the defendant engaged in speech for which it was held liable. As explained earlier, here there is doubt, very real doubt.[20] It is McDermott's conduct in handing over the tape to the newspapers, not anything he wrote or said, for which Boehner seeks recovery under § 2511. And because we are dealing with conduct, McDermott's case falls squarely within the Supreme Court's *O'Brien* analysis. Whether the statute would be constitutional as applied to a

18. This recital hardly exhausts the category of laws prohibiting disclosure of information without regard to whether the recipient violated the law in obtaining the information. For instance, lawyers may suffer suspension or disbarment for revealing client confidences. Those who rent or sell video tapes may be held liable for disclosing "personally identifiable information concerning" their customers. 18 U.S.C. § 2710. With some exceptions, employees of state motor vehicle departments may not disclose information about individuals who have received drivers' licenses or vehicle registrations. 18 U.S.C. § 2721. Under 18 U.S.C. § 794, it is an offense, punishable by death or imprisonment, for anyone intending to injure the United States to disclose to a foreign nation documents relating to our national defense. Tax return preparers are subject to civil and criminal penalties for the unauthorized disclosure of tax return information. *See* 26 U.S.C. §§ 6713, 7216; *see also* 26 U.S.C. § 6103 (imposing duty of confidentiality on IRS employees); *Tax Analysts v. IRS*, 117 F.3d 607, 613 (D.C.Cir.1997) ("The IRS and the office of Chief Counsel are the gatekeepers of federal tax information. Through § 6103, Congress charged these two agencies and their employees with the duty of protecting return information from disclosure to others within the federal government, and to the public at large.").

19. We emphasize again that in each of these cases, the information the defendant published was in the public domain, and the government was responsible for putting it there. Not so here: the conference call was not in the public domain and there was no government involvement in making it public.

20. It is good that our dissenting colleague believes the press has no greater First Amendment rights than anyone else. The Supreme Court agrees with him. So do we. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 265–66, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 777, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); *Davis v. Schuchat*, 510 F.2d 731, 734 n. 3 (D.C.Cir.1975).

newspaper who published excerpts from the tape—who, in other words, engaged in speech—thus raises issues not before us.

■ Our dissenting colleague also thinks the statute "burdens speech based on its content—that is [§ 2511(1)(c) forbids] its publication because it contains information obtained at an earlier time in an illicit fashion." Dissenting op. at 485. One might as well say that prosecuting a dealer in stolen books burdens his speech on the basis of the contents of the books. That of course would be silly, but as far as content discrimination is concerned, there is no relevant difference here. We have already explained why McDermott's liability under § 2511(1)(c) does not turn on who said what during the conference call. McDermott would have violated the law if he had handed over the tape of an illegally intercepted communication between a husband and wife, or an investor and stockbroker, or a judge and law clerk. Each such conversation has in common that someone violated federal law to intercept it, but this relates to the method of acquisition not the contents of the communication. In all of this, it is important to keep McDermott's defense firmly in mind—he claims that § 2511(1)(c) unconstitutionally burdens *his* speech in this case. One cannot possibly evaluate that claim without making the effort to identify precisely what McDermott said, or wrote, or did to incur liability. Our dissenting colleague has not made the effort, which may be why he has fallen into the trap of equating the conversation on the tape with the contents of McDermott's speech.

Our colleague cannot understand why Congress thought it necessary to prohibit not only the interception of communications, but also their disclosure. Dissenting op. at 485. The reasons are apparent. One is that prohibiting disclosure furthers the freedom of speech, and reduces the damage caused by unlawful eavesdropping.

Another is that prohibiting disclosure removes an incentive for illegal interceptions. But in our colleague's judgment, disclosure should never be prohibited because illegal political espionage might uncover misdeeds that would otherwise go undetected. Dissenting op. at 483–84. This is the old ends-justifies-the-means rationale. Worse still, it is a rationale willing to sacrifice everyone's freedom not to have their private conversations revealed to the world, because some criminal at some time might illegally "seize" some politician's incriminating conversation.

Finally, our colleague believes that "the First Amendment permits the government to enjoin or punish the release of information by persons who have voluntarily entered into positions requiring them to treat the information with confidentiality." Dissenting op. at 485. That describes this case perfectly. McDermott "voluntarily" entered into just such a position when he accepted the illicit tape from the Martins. At that point he had a duty, if not of "confidentiality," then of nondisclosure. The duty stemmed of course from every citizen's responsibility to obey the law, of which § 2511(1)(c) is a part.

\* \* \*

For the reasons stated, we hold that § 2511(1)(c) and the Florida statute, *see supra* note 2, are not unconstitutional as applied in this case. Accordingly, the judgment of the district court is reversed and the case is remanded.

*So ordered.*

Opinion filed by Circuit Judge GINSBURG concurring in the judgment and in Parts I, II.B, and II.D (except the first and last paragraphs) of the opinion for the Court:

Although I agree that § 2511(1)(c)\* is not unconstitutional as applied in this case, I find it unnecessary, in order to reach

---

\* My conclusions regarding § 2511(1)(c) apply as well to the Florida statute. *See* Op. at 466 n.2.

that conclusion, to address a number of the questions addressed by Judge Randolph. Specifically, I assume rather than decide that (1) McDermott's delivery of the tape to the newspapers constitutes speech protected by the First Amendment to the Constitution of the United States—a proposition that no party to the case disputes; and (2) the holding of *Florida Star*, namely, that publication of "lawfully obtain[ed,] truthful information about a matter of public significance ... may not constitutionally [be] punish[ed] ... absent a need to further a state interest of the highest order," 491 U.S. 524, 533, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (quoting *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979)), applies in principle to this case. Because McDermott did not in fact lawfully obtain the tape, however, he may be punished under § 2511(1)(c), as he concedes, if the statute as applied to him survives intermediate scrutiny. I conclude it does for the reasons stated in the opinion for the Court.

Although by its terms *Florida Star* does not apply to all cases involving privately held information, *see* 491 U.S. at 534, 109 S.Ct. 2603 ("To the extent sensitive information rests in private hands, the government may under some circumstances forbid its nonconsensual acquisition, thereby bringing outside of the *Daily Mail* principle the publication of any information so acquired"), we may assume, as McDermott argues, that *Florida Star* does apply here. Therefore, there is no need to decide whether "publication," as used in footnote 8 of that case, must mean "publication by the media" and cannot mean "divulged by an individual," as it does in the context of libel law. *See* Op. at 472–75. Nor need we delve into the ambiguities in the Court's *dictum* regarding privately held information—under what circumstances? what is "sensitive information"?—because

even if *Florida Star* applies to McDermott's dissemination of the privately held information contained in the illegal wiretap, he did not lawfully acquire that information. McDermott therefore does not satisfy an essential element of the *Florida Star* test. *See* 491 U.S. at 536, 109 S.Ct. 2603 ("The first inquiry is whether the newspaper 'lawfully obtain[ed] [the] information' ").

Indeed, McDermott concedes that the Martins, who violated § 2511(1)(a) in acquiring the information they passed on to him, are not protected by the principle of *Florida Star*. *See* Op. at 469. Nonetheless, he argues that he lawfully obtained the tape from them because no federal statute prohibits receiving the contents of an illegal wiretap. That does not mean, however, that McDermott "lawfully obtain[ed]" the information. Though the Congress has not prohibited the receipt of information obtained by means of an illegal wiretap, it has prohibited the intentional and knowing disclosure of the contents of such a wiretap. Not only was the transaction in which McDermott obtained the tape therefore illegal—albeit only the Martins could be punished for effectuating it—but McDermott knew the transaction was illegal at the time he entered into it. *See* Op. at 465, 476. One who obtains information in an illegal transaction, with full knowledge the transaction is illegal, has not "lawfully obtain[ed]" that information in any meaningful sense.** And the Court's decision in *Florida Star* was not an exercise in empty formalism. *See* Op. at 471.

McDermott points nonetheless to this passage in *Florida Star*:

> [T]hat the [Police] Department apparently failed to fulfill its obligation under [state law] not to "cause or allow to be ... published" the name of a

---

** For example, the District of Columbia "prohibits solicitation and pimping, but does not criminalize prostitution itself." *United States v. Jones*, 909 F.2d 533, 538 (D.C.Cir.1990). Therefore, a "John" who has sex in exchange for money, but who did not solicit that sex, has apparently violated no law. Only the most formal minded, however, would describe that sex as having been lawfully obtained.

480

sexual offense victim [does not] make the newspaper's ensuing receipt of this information unlawful. Even assuming the Constitution permitted a State to proscribe *receipt* of information, Florida has not taken this step.

491 U.S. at 536, 109 S.Ct. 2603 (emphasis in original). The Court's reference to a State "proscrib[ing] receipt of information" must be read in light of Florida's decision not to prohibit all disclosures of the name of a rape victim. *See id.* at 540, 109 S.Ct. 2603 (noting that statute prohibits only publication in mass media, but "does not prohibit the spread by other means of the identities of victims of sexual offenses"). Accordingly, the transaction in which the newspaper obtained the name was not illegal *per se*; if the newspaper had not later published the name, the police department would have violated no law. By contrast, the Congress prohibited the transaction in which McDermott obtained the tape, without regard to whether its contents were subsequently published as a result.

In any event, as noted in the opinion for the Court at 474 n.13, the remarks upon which McDermott relies are apparently confined to information furnished by the Government. The Court recognized in *Florida Star* that when information is in the hands of the Government "a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts." 491 U.S. at 534, 109 S.Ct. 2603. When sensitive information is in private hands, however, the same cannot be said; the Government has at once less power to prevent nonconsensual acquisition of the information and more need to prohibit its subsequent dissemination, whether by the thief or by one such as McDermott who received it from the thief. *Cf. id.*

In sum, nothing in *Florida Star* requires us to accept McDermott's claim that he "lawfully obtain[ed]" the tape simply because no statute prohibited his receiving it. Nor does McDermott provide us with any reason to extend *Florida Star* in a manner that, as the district court put it, permits "a criminal [to] launder the stains off illegally obtained property simply by giving it to someone else, when that other person is aware of its origins." *Boehner v. McDermott*, No. Civ. 98–594, 1998 WL 436897, at *4 (D.D.C. July 28, 1998). I therefore conclude only that one does not "lawfully obtain[ ]," within the intendment of that phrase in *Florida Star*, information acquired in a transaction one knows at the time to be illegal. *See United States v. Riggs*, 743 F.Supp. 556, 559 (N.D.Ill.1990) (criminal defendant who "did not actually steal the [information, but] was completely aware that it was stolen when he received it" did not "lawfully obtain[ ]" it).

McDermott concedes, and both Boehner and the Government agree, that if *Florida Star* does not require the application of strict scrutiny in this case, then we should apply at most intermediate scrutiny. I agree the statute passes that test for the reasons given in the opinion for the Court at 467–70.

SENTELLE, Circuit Judge, dissenting:

"Hard cases make bad law," is a cliche. Phrases become cliches through much repetition. Much repetition sometimes results from the inherent truth in the phrase much repeated. I fear that by not making the hard choice, the court today once again proves that hard cases still make bad law.

A statute of the United States makes it a felony for anyone to "intentionally intercept[ ] ... any wire, oral, or electronic communication...." 18 U.S.C. § 2511(1)(a) (1994).[1] Further subsections

1. Though the litigation before us concerns also Florida statutes, *see* FLA. STAT. ANN. §§ 934.03(1)(c) & 934.10 (West 1996), these statutes are patterned after the federal statute and do not differ from it in any constitutional-

ly significant way. Therefore, for simplicity I will direct the discussion in my dissent to the federal statute, intending the reasoning to apply as to both.

of the same act render it felonious to "intentionally disclose[ ] ... to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of" such communication; or to "intentionally use[ ] the contents" of any such intercepted communication. 18 U.S.C. § 2511(1)(c)-(d) (1994). On the undisputed record before us, Alice and John Martin committed at least two and probably three of the felonies created by this Act of Congress. Knowing of these felonies, a Member of the Congress of the United States, the elected representative of his people, the sworn servant of the law, dealt with the felons, received from them their feloniously obtained communications, and converted it to his own use. He obtained these communications not for the purpose of disclosing the felonies or assisting in the enforcement of law, but solely for the purpose of using the contents of the communications in the pursuit of the politics of personal destruction. To compound the wrong, this was not just any congressman, but the co-chair of the House Ethics Committee. In other words, a public official charged with the oversight of the ethics of his colleagues willfully dealt with felons and knowingly received unlawfully obtained evidence on the chance that he might be able to use something contained therein to embarrass one of the colleagues whose ethics he was charged with policing. Protecting such an official in such an act cannot be an easy thing to do. Nonetheless, it is, I think, that hard task that the Constitution compels us to undertake.

The first element of the dispute between the parties, and perhaps the decisive one, is the level of scrutiny applicable to a constitutional review of the statutes. McDermott contends, and I agree, that this case is controlled by a line of Supreme Court cases dealing with various gradations of the question: Under what circumstances may state officials constitutionally punish publication of information?[2] As I read those cases, the answer is that the state may do so, if at all, only when the regulation survives a test of strict scrutiny—it must "further a state interest of the highest order." *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979).

The line of relevant Supreme Court cases begins with *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). In *Cox Broadcasting*, the Supreme Court reviewed a judgment in favor of the family of a rape-murder victim against a broadcast corporation which had published the name of the victim in violation of a Georgia statute, GA. CODE ANN. § 26–9901 (1972), which made it a misdemeanor to publish or broadcast the name or identity of a rape victim. Although the Georgia courts vacillated between reliance on the statute and common law tort theories " 'for the invasion of the ... right of privacy, or for the tort of public disclosure,' " in the end the Georgia Supreme Court did pass on the constitutionality of the statute and sustained it as a " 'legitimate limitation on the right of freedom of expression contained in the First Amendment.' " 420 U.S. at 474, 475, 95 S.Ct. 1029 (quoting *Cox Broadcasting Corp. v. Cohn*, 231 Ga. 60, 200 S.E.2d 127 (1973)). The high court, noting that the broadcasting company had obtained the published information from public records, declared itself "reluctant to embark on a

2. While I refer throughout this opinion to punishment, for First Amendment purposes I consider the term to include civil damage provisions. As the Supreme Court noted in *New York Times Co. v. Sullivan*, "What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel. The fear of damage awards ... may be markedly more inhibiting than the fear of prosecution under a criminal statute." 376 U.S. 254, 277, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (footnote and citation omitted). Similarly, the discussions of prohibition of publishing included in some of the cases which follow apply to post-publication punishment as well as to prior restraint.

course that would make public records generally available to the media but forbid their publication if offensive to the sensibilities of the supposed reasonable man." *Id.* at 496, 95 S.Ct. 1029. Then, in an opinion narrowed to the issue most squarely before it, the Court held that "[a]t the very least, the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records." *Id.* *Cox Broadcasting* thus left open the question of the state's ability to impose liability for publishing information not released to the public in official court records.

Two years after *Cox Broadcasting*, in *Oklahoma Publishing Co. v. District Court*, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977), the Supreme Court reached the same result as to information not released in public records, but otherwise publicly available. Several reporters, including those employed by the petitioner company, had been present in the courtroom during the hearing of an eleven-year-old boy charged with second degree murder. The district court of Oklahoma County enjoined members of the news media from " 'publishing, broadcasting, or disseminating, in any manner, the name or picture of [a] minor child' " in coverage of pending juvenile court proceedings. *Id.* at 308, 97 S.Ct. 1045 (quoting pretrial order). Citing *Cox Broadcasting*, as well as *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), as compelling its result, the Supreme Court held that "the First and Fourteenth Amendments will not permit a state court to prohibit the publication of widely disseminated information obtained at court proceedings which were in fact opened to the public." *Id.* at 310, 97 S.Ct. 1045. The respondent had attempted to distinguish *Cox Broadcasting* on the basis that a state statute provided that juvenile hearings would be closed unless the court specifically opened them to the public, and that the record did not reflect a specific opening in the instant case. The Supreme

Court found that this made no difference, but held that the critical fact was that the information published, that is "[t]he name and picture of the juvenile" were " 'publicly revealed in connection with the prosecution of the crime[.]' " *Id.* at 311, 97 S.Ct. 1045 (quoting *Cox Broadcasting*, 420 U.S. at 471, 95 S.Ct. 1029). While *Oklahoma Publishing*, like *Cox Broadcasting*, is still not factually identical to the instant case, it moves one step further toward compelling the result sought by McDermott.

*Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979), goes yet another step. That case involved the publication of the identity of a juvenile offender obtained by reporters lawfully monitoring a police scanner. The reporters were indicted under a statute, W.Va.Code § 49–7–3 (1976), making it unlawful to knowingly publish the name of a juvenile involved in a juvenile court proceeding. The United States Supreme Court upheld the West Virginia Supreme Court decision prohibiting prosecution of the indictment on constitutional grounds. The Supreme Court expressly declared its holding a narrow one. Proclaiming that there was "no issue ... of unlawful press access to confidential judicial proceedings, [and] no issue ... of privacy or prejudicial pretrial publicity," *id.* at 105, 99 S.Ct. 2667 (citation omitted), it declared that "[a]t issue is simply the power of a state to punish the truthful publication of an alleged juvenile delinquent's name lawfully obtained by a newspaper." *Id.* at 105–06, 99 S.Ct. 2667 (footnote omitted). In *Cox Broadcasting* and *Oklahoma Publishing*, the information sought to be suppressed was released by the court itself, either in public record or by opening access to the public. In *Daily Mail*, the information came from a scanner, but it was lawfully obtained. The holding was narrow one, but it moved narrowly toward encompassing the protection sought by McDermott today.

Closer still comes *Florida Star v. B.J.F.,* 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989). In *Florida Star,* a woman referred to by her initials, BJF, had been robbed and sexually assaulted by an unknown assailant. The investigating law enforcement department prepared and placed in its pressroom an incident report identifying her by her full name. Employees of the Florida Star newspaper obtained the report and published an account of the sexual assault, including her name, in violation of a Florida statute which "ma[de] it unlawful to 'print, publish, or broadcast ... in any instrument of mass communication' the name of the victim of a sexual offense." *Florida Star,* 491 U.S. at 526, 109 S.Ct. 2603 (quoting FLA.STAT. § 794.03 (1987)) (footnote omitted). BJF sued civilly, relying on the statute for a standard of negligence per se. She obtained a judgment which stood through the state appellate process. The newspaper appealed to the United States Supreme Court arguing that imposing civil liability on the newspaper, pursuant to the statute, violated the First Amendment. The Supreme Court agreed.

The Supreme Court in *Florida Star* recognized that it had articulated in *Daily Mail* a principle derived from a synthesis of its prior cases: " '[I]f a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order.' " 491 U.S. at 533, 109 S.Ct. 2603 (quoting *Daily Mail,* 443 U.S. at 103, 99 S.Ct. 2667). Thus, the Supreme Court made it plain that the fact of constitutional significance in *Cox Broadcasting, Oklahoma Publishing* and *Daily Mail* was not that the publishers in those cases had obtained the information at issue from public record or public hearings, or publicly available communications from official sources, but that they had lawfully obtained the information. Even in *Florida Star,* the Court expressly limited the scope of its ruling, holding: "only that where a news-paper publishes truthful information which it has lawfully obtained, punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order...." 491 U.S. at 541, 109 S.Ct. 2603. Because I believe this holding of the Supreme Court instructs our decision on the facts before us, I would hold that 18 U.S.C. § 2511 cannot constitutionally be applied to penalize McDermott's publication of the contents of the unlawfully intercepted communication.

I concede at the outset that there are distinctions between our case and the cases in the *Cox Broadcasting–Florida Star* line. However, I think none of the distinctions permits a difference in result. First, I think it is of no constitutional significance that the holding in *Florida Star* expressly covered the situation "where a *newspaper* publishes truthful information," while McDermott is not a newspaper. I have never believed that the First Amendment protection of "the freedom ... of the press," afforded greater protection to professional publishers than it does to anyone who owns a typewriter, or for that matter than its protection of "the freedom of speech" affords those who communicate without writing it down. Indeed, it is safe to say that when the Framers of the Constitution used the expression "the press, they did not envision the large, corporate newspaper and television establishments of our modern world," but rather, "refer[red] to the many independent printers who circulated small newspapers or published writers' pamphlets for a fee." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 360, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (Thomas, J., concurring). Therefore, as the court holds today that the state can punish the release by McDermott based on the manner in which his source obtained that information, in a later day the state can burden the publishers of newspapers and the broadcasters of television and radio on the same basis.

I can envision felonious eavesdroppers like the Martins in this case obtaining not marginally embarrassing information about congressmen but information of critical public importance about, for example, some public official's accepting a bribe or committing perjury or obstruction of justice. Even if those hypothetical felons dumped information of that critical nature not into the hands of politicians but of a newspaper publisher or a television news network, the public could never know of the wrongdoing, because under today's ruling, those news media would be barred from further publication of that information. Therefore, I cannot think that the identity of the communicator can be a distinction of difference.

Judge Randolph's repeated attempt to distinguish between "newspapers" on the one hand and "sources" (apparently meaning all those who are not newspapers but might communicate information to a newspaper) on the other is without substance or force. His attempt to extend to newspapers some First Amendment protection not available to all those others who might communicate by stating that "sources do not publish; the newspapers do," creates a hierarchy of First Amendment protection for a publishing aristocracy nowhere suggested in the Amendment, its history, or the cases applying it. As I noted above, the Framers' use of the expression "the press" does not connote a protected entity, but rather a protected activity. See *McIntyre*, 514 U.S. at 360, 115 S.Ct. 1511 (Thomas, J., concurring). The First Amendment protections of speech and press extend to those who speak and those who write, whether they be press barons, members of Congress, or other sources.

Judge Randolph's further attempt to pass off what McDermott did as unprotected conduct rather than protected speech is likewise unconvincing. Contrary to Judge Randolph's essential position, it was not McDermott's "conduct in delivering the tape that gives rise to his potential liability under § 2511(1)(c)." Maj. Op. at 467.

What made his conduct punishable under the statute was the information communicated on the tapes. He could have provided the two newspapers with all the tapes in Washington on a given day and incurred no liability but for the speech contained on the tapes. Indeed, the majority's hypothetical concerning the Martins breaking into Boehner's office stealing a tape and giving it to McDermott illustrates the weakness of the majority's position, not its strength. Had the Martins broken into the office and stolen such a tape and given it to McDermott, he would have received stolen property without regard to its contents. Had he then copied its contents to other tapes and passed those copies off to *The New York Times* and *The Washington Post*, he would have incurred no liability under 18 U.S.C. § 2511, nor would he have aggravated his crime of receiving stolen property. What he is being punished for here is not conduct dependent upon the nature or origin of the tapes; it is speech dependent upon the nature of the contents.

Next, and of somewhat greater persuasion, is the distinction that the information was unlawfully obtained somewhere in the chain. That is to say, the *Florida Star* Court limited its holding to truthful information, lawfully obtained. Indeed, the Court in *Florida Star* expressly reserved "the issue whether, in cases where information has been acquired *unlawfully* by a newspaper or *by a source*, government may ever punish not only the unlawful acquisition, but the ensuing publication as well." *Florida Star*, 491 U.S. at 535 n. 8, 109 S.Ct. 2603 (additional emphasis added) (noting further that "[t]his issue was raised but not definitively resolved in *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), and reserved in *Landmark Communications*, 435 U.S. at 837, 98 S.Ct. 1535."). That is the question. The second half of that question is the one we must answer today. Where the punished publisher of information has obtained the information in question in a manner lawful in itself but

Untranslatable

from a source who has obtained it unlawfully, may the government punish the ensuing publication of that information based on the defect in a chain? I say not. This separates me from the majority.

As the Court held in *Florida Star*, "punishment may lawfully be imposed, if at all" upon the publisher of truthful information, lawfully obtained, "only when narrowly tailored to a state interest of the highest order...." 491 U.S. at 541, 109 S.Ct. 2603. The Supreme Court has elsewhere described "the 'now settled approach' that state regulations 'imposing severe burdens on speech ... [must] be narrowly tailored to serve a compelling state interest.'" *Buckley v. American Constitutional Law Found.*, 525 U.S. 182, 119 S.Ct. 636, 642 n. 12, 142 L.Ed.2d 599 (1999) (internal quotations and punctuation omitted) (quoting Thomas, J., concurring).

Otherwise put, the statutes before us burden speech based on its content—that is they forbid its publication because it contains information obtained at an earlier time in an illicit fashion. It is established Supreme Court law that when the state "establishes a financial disincentive to ... publish works with a particular content ... 'the State must show that its regulation is necessary to serve a compelling State interest and is narrowly drawn to achieve that end.'" *Simon & Schuster, Inc. v. New York State Crime Victims Board*, 502 U.S. 105, 118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (quoting *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987)). I will not dispute that the protection of the privacy of electronic communication is a compelling state interest. I will concede for purposes of the present case that punishment of an unlawful interceptor, both criminally and by the allowance of civil damages, may well be sufficiently narrowly tailored to survive even the strict scrutiny required here. I do not, however, see that either the United States or the State of Florida has established that an undifferentiated burden on

the speech of anyone who acquires the information contained in the communication from the unlawful interceptor is necessary to accomplish the state's legitimate goal or narrowly tailored to serve that end. I do not see how we can draw a line today that would punish McDermott and not hold liable for sanctions every newspaper, every radio station, every broadcasting network that obtained the same information from McDermott's releases and published it again. Not only is this not narrow tailoring, this is not tailoring of any sort. As I recognized above, we are not squarely within the language of *Florida Star*. I think we must answer the question reserved in that decision, and I think we must answer it against the burdening of publication.

Although appellant offers other distinctions from the reasoning of *Florida Star*, I find none compelling, or worth more than passing mention. It is true, as appellant and the United States as intervenor argue, that the Supreme Court has held that the First Amendment permits the government to enjoin or punish the release of information by persons who have voluntarily entered into positions requiring them to treat that information with confidentiality. *See, e.g., Snepp v. United States*, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (upholding constructive trust against all profits of the publication of truthful information of public importance lawfully obtained through petitioner's employment at the CIA, where he had contracted to keep the same confidential); *United States v. Aguilar*, 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995) (allowing punishment of a federal judge who disclosed sensitive information concerning statutorily authorized wiretap); *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) (upholding restrictions on disclosure of otherwise confidential information obtained by court order in civil discovery). Appellant and intervenor argue that McDermott can be punished for his disclosure because of his having, in

their view, obtained the information at issue in his capacity as a member of the House Ethics Committee. I cannot agree. McDermott did not in fact obtain the information in his official capacity. The felons who communicated it to him were not looking for him to use his official ethical capacity but rather his unofficial political capacity to disseminate their unlawfully obtained information. It may well be the case that had he obtained the same information, for example, by Committee subpoena, he could not have lawfully disclosed it and his disclosure would not be constitutionally protected. Indeed, that is perhaps more likely than not. But those are not the facts before us.

### Conclusion

For the reasons set forth above, I would uphold the judgment of the district court and I respectfully dissent from the decision of the court to the contrary.