# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 31, 2006 & January 25, 2007

Decided May 1, 2007

No. 04-7203

JOHN A. BOEHNER,
APPELLEE

v.

JAMES A. MCDERMOTT,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 98cv00594)

*Christopher Landau* argued the causes for appellant. With him on the briefs was *Frank Cicero Jr.*

*Theodore J. Boutrous Jr.* and *Thomas H. Dupree Jr.* were on the brief for *amici curiae* Dow Jones & Company, et al. in support of appellant urging reversal.

*Michael A. Carvin* argued the causes for appellee. With him on the briefs was *Louis K. Fisher.*

Before: GINSBURG, *Chief Judge*, and SENTELLE, HENDERSON, RANDOLPH, ROGERS, TATEL, GARLAND, BROWN and GRIFFITH, *Circuit Judges*.[*]

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

Concurring opinion filed by *Circuit Judge* GRIFFITH.

Dissenting opinion filed by *Circuit Judge* SENTELLE, in which *Circuit Judges* ROGERS, TATEL and GARLAND join and *Circuit Judge* GRIFFITH joins as to Part I.

RANDOLPH, *Circuit Judge*: Both parties to this case are members of the United States House of Representatives. John A. Boehner, the plaintiff, represents Ohio's Eighth District. James A. McDermott, the defendant, represents Washington's Seventh District. The complaint alleged that Representative McDermott violated 18 U.S.C. § 2511(1)(c) when he disclosed a tape recording of an illegally intercepted conversation in which Representative Boehner participated.

In our initial decision in this case, we held that Representative McDermott did not have a First Amendment right to disclose the tape. *Boehner v. McDermott*, 191 F.3d 463 (D.C. Cir. 1999). The Supreme Court vacated our decision and returned the case to us for further consideration in light of *Bartnicki v. Vopper*, 532 U.S. 514 (2001). *See* 532 U.S. 1050 (2001). We remanded the case to the district court. After the parties engaged in discovery, the district court granted summary judgment in favor of Representative Boehner, awarding him $ 10,000 in statutory damages, *see* 18 U.S.C. § 2520(c)(2), $ 50,000 in punitive damages, and reasonable attorney's fees and costs. A panel of this court, with one judge dissenting,

---

[*] Circuit Judge Kavanaugh did not participate in this matter.

affirmed on the ground that Representative McDermott had not lawfully obtained the tape recording. *Boehner v. McDermott*, 441 F.3d 1010 (D.C. Cir. 2006). We vacated that decision and ordered the case reheard en banc. *Boehner v. McDermott*, No. 04-7203 (D.C. Cir. June 23, 2006) (order granting rehearing en banc).

I.

On remand, the record developed in discovery showed the following.

On December 21, 1996, Representative Boehner participated in a conference call with members of the Republican Party leadership, including then-Speaker of the House Newt Gingrich. At the time of the conversation Gingrich was the subject of an investigation by the House Committee on Standards of Official Conduct, commonly known as the House Ethics Committee. Representative Boehner was chairman of the House Republican Conference. The participants discussed how they might deal with an expected Ethics Committee announcement of Gingrich's agreement to accept a reprimand and to pay a fine in exchange for the Committee's promise not to hold a hearing.

Representative Boehner was in Florida when he joined the conference call. He spoke from a cellular telephone in his car. John and Alice Martin, who lived in Florida, used a police radio scanner to eavesdrop on the conversation, in violation of 18 U.S.C. § 2511(1)(a). They recorded the call and delivered the tape in a sealed envelope to the Florida office of then-Representative Karen Thurman. Staff members forwarded the envelope to Thurman's Washington office. On January 8, 1997, Thurman's chief of staff learned that the Martins would be visiting the Washington office. Both Thurman and her chief of

staff sought legal advice about accepting the tape, presumably because they knew of its contents and how it had been recorded. At some point they consulted then-Representative David Bonior's chief of staff and legislative director. Stan Brand, former General Counsel to the House of Representatives, advised that the tape should not be accepted under any circumstances and that it should be turned over to the Ethics Committee or other appropriate authorities. When the Martins arrived at Thurman's office, her chief of staff returned the tape in its unopened envelope and suggested they turn it over to the Ethics Committee.

At about 5 p.m. on January 8, 1997, in a small anteroom adjacent to the Ethics Committee hearing room, the Martins delivered the tape to Representative McDermott in a sealed 8-1/2" by 11" envelope. At the time, Representative McDermott was the ranking Democrat on the Ethics Committee. With the envelope the Martins also delivered a business card and a typed letter dated January 8, 1997, and addressed to "Committee On Standards of Official Conduct . . . Jim McDermott, Ranking Member." The letter read:

> Enclosed in the envelope you will find a tape of a conversation heard December 21, 1996 at about 9:45 a.m. The call was a conference call heard over a scanner. We felt the information included were [sic] of importance to the committee. We live in the 5th. Congressional District and attempted to give the tape to Congresswoman Karen Thurman. We were advised by her to turn the tape directly over to you. We also understand that we will be granted immunity.
>
> My husband and I work for Columbia County Schools in Columbia County Florida. We pray that committee will consider our sincerity in placing it in your hands.

We will return to our home today.

Thank you for your consideration.

John and Alice Martin

After conversing with the Martins, Representative McDermott accepted the envelope and returned to the Ethics Committee hearing room.

Later that evening, during a recess, Representative McDermott left the Ethics Committee hearing room and went to his office. There he opened the Martins' envelope, emptied the contents, and listened to the tape. Still later, he called two reporters: Jeanne Cummings of *The Atlanta Journal-Constitution*, for whom he left a message, and Adam Clymer of *The New York Times*, whom he reached. Clymer went to Representative McDermott's office, listened to the tape, and made a recording of it. Cummings returned Representative McDermott's call the next day and came to his office and listened to the tape.

The contents of the tape had substantial news value. In particular, the tape revealed information bearing on whether Gingrich had violated his settlement agreement with the Ethics Committee. On January 10, 1997, *The New York Times* published a front-page article by Clymer entitled "Gingrich Is Heard Urging Tactics in Ethics Case." The article, which included lengthy excerpts of the recorded conversation, reported the circumstances leading to the disclosure of the tape:

> The call was taped by people in Florida who were unsympathetic to Mr. Gingrich and who said they heard it on a police scanner that happened to pick up the cellular telephone transmissions of one of the

> participants. It was given to a Democratic Congressman, who made the tape available to The New York Times. . . .
>
> Mr. Gingrich, Mr. Bethune and the others discussed their tactics in a conference telephone call, a transcript of which was made available by a Democratic Congressman hostile to Mr. Gingrich who insisted that he not be identified further.
>
> The Congressman said the tape had been given to him on Wednesday by a couple who said they were from northern Florida. He quoted them as saying it had been recorded off a radio scanner, suggesting that one participant was using a cellular telephone. They said it was recorded about 9:45 A.M. on Dec. 21.

Adam Clymer, *Gingrich Is Heard Urging Tactics in Ethics Case*, N.Y. TIMES, Jan. 10, 1997, at A1, A20. *The Atlanta Journal-Constitution* ran a similar story the following day. *See* Jeanne Cummings, *Gingrich Ethics Case: Panel Trusted His Motives, Gingrich Told GOP Allies*, ATLANTA J.-CONST., Jan. 11, 1997, at 6A.

On January 13, 1997, the Martins held a press conference and identified Representative McDermott as the congressman to whom they had delivered the tape. Representative McDermott then sent copies of the tape to the offices of the Ethics Committee and resigned from the Committee. The Committee Chairman, then-Representative Nancy Johnson, forwarded the tape to the Department of Justice. The government prosecuted the Martins for violating 18 U.S.C. § 2511(1)(a), which forbids unauthorized interception of "wire, oral, or electronic communication." The Martins pled guilty and were fined $500.

On cross motions for summary judgment, the district court held that Representative McDermott violated 18 U.S.C. § 2511(1)(c) when he disclosed the tape to the reporters. *Boehner v. McDermott*, 332 F. Supp. 2d 149, 158 (D.D.C. 2004). Section 2511(1)(c) makes intentional disclosure of any illegally intercepted conversation a criminal offense if the person disclosing the communication knew or had "reason to know" that it was so acquired. The district court viewed the crucial issue to be whether Representative McDermott lawfully obtained the tape from the Martins. *See id.* at 163-64. The court held there was no genuine issue of material fact that the Martins' letter to Representative McDermott had been outside of the envelope containing the tape and that Representative McDermott must have read it. *Id.* at 166-67, 169. This established that Representative McDermott, when he accepted the tape, knew the Martins had illegally intercepted the conversation and illegally disclosed it to him. It followed that he did not lawfully obtain the tape. *Id.* at 165-66, 169. On appeal, a divided panel of this court agreed that Representative McDermott obtained the tape unlawfully, but for reasons other than those the district court gave. 441 F.3d at 1016-17.

## II.

This is an as-applied challenge to 18 U.S.C. § 2511(1)(c). The question therefore is whether Representative McDermott had a First Amendment right to disclose to the media this particular tape at this particular time given the circumstances of his receipt of the tape, the ongoing proceedings before the Ethics Committee, and his position as a member of the Committee. In answering this question we shall assume arguendo that

Representative McDermott lawfully obtained the tape from the Martins.[1]

Whatever the *Bartnicki* majority meant by "lawfully obtain," *see* 532 U.S. at 538 (Breyer, J., joined by O'Connor, J., concurring), the decision does not stand for the proposition that anyone who has lawfully obtained truthful information of public importance has a First Amendment right to disclose that information. *Bartnicki* avoided laying down such a broad rule of law, *see* 532 U.S. at 528-29, and for good reason. *See* Rodney A. Smolla, *Information as Contraband: The First Amendment and Liability for Trafficking in Speech*, 96 NW. U. L. REV. 1099, 1126-32 (2002). There are many federal provisions that forbid individuals from disclosing information they have lawfully obtained. The validity of these provisions has long been assumed. Grand jurors, court reporters, and prosecutors, for instance, may "not disclose a matter occurring before the grand jury." FED. R. CRIM. P. 6(e)(2)(B). The Privacy Act imposes criminal penalties on government employees who disclose agency records containing information about identifiable individuals to unauthorized persons. *See* 5 U.S.C. § 552a(i)(1). The Espionage Act punishes officials who willfully disclose sensitive national defense information to persons not entitled to receive it. *See* 18 U.S.C. § 793(d). The Intelligence Identities Protection Act prohibits the disclosure of a covert intelligence agent's identity. *See* 50 U.S.C. § 421. Employees of the Internal Revenue Service, among others, may not disclose tax return information. *See* 26 U.S.C. § 6103(a). State motor vehicle department employees may not make public information about an individual's driver's license or registration.

---

[1] Chief Judge Ginsburg and Judges Henderson, Randolph, and Brown believe that, for the reasons given in the second panel opinion in this case, Representative McDermott did not lawfully obtain the tape. *See* 441 F.3d at 1016.

*See* 18 U.S.C. § 2721. Employees of the Social Security Administration, as well as other government employees, may not reveal social security numbers or records. *See* 42 U.S.C. § 405(c)(2)(C)(viii)(I), (III).[2] Judicial employees may not reveal confidential information received in the course of their official duties. *See* CODE OF CONDUCT FOR JUDICIAL EMPLOYEES Canon 3D. And so forth.

In analogous contexts the Supreme Court has sustained restrictions on disclosure of information even though the information was lawfully obtained. The First Amendment did not shield a television station from liability under the common law right of publicity when it filmed a plaintiff's "human cannonball" act and broadcast the film without his permission. *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 575-79 (1977). When a newspaper divulged the identity of an individual who provided information to it under a promise of confidentiality, the First Amendment did not provide the paper with a defense to a breach of contract claim. *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991). The First Amendment did not prevent the government from enforcing reasonable confidentiality restrictions on former employees of the CIA. *See Snepp v. United States*, 444 U.S. 507, 509-10 (1980). Parties to civil litigation did not "have a First Amendment right to disseminate, in advance of trial, information gained through the pretrial discovery process." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 22, 37 (1984).

---

[2] The government can also limit disclosures by persons who are not its employees without running afoul of the First Amendment. Private attorneys who reveal their clients' confidences may be punished for doing so. And those who sell or rent video tapes or DVDs ordinarily may not reveal "personally identifiable information concerning" their customers. *See* 18 U.S.C. § 2710(b).

In *United States v. Aguilar*, 515 U.S. 593 (1995), a case closely analogous to this one, the Supreme Court held that the First Amendment did not give a federal judge, who obtained information about an investigative wiretap from another judge, the right to disclose that information to the subject of the wiretap. The judge challenged his conviction for violating 18 U.S.C. § 2232(c), which prohibits the improper disclosure of an investigative wiretap.[3] In rejecting his First Amendment claim, the Court wrote that the judge was not "simply a member of the general public who happened to lawfully acquire possession of information about the wiretap; he was a Federal District Court Judge who learned of a confidential wiretap application from the judge who had authorized the interception, and who wished to preserve the integrity of the court. Government officials in sensitive confidential positions may have special duties of non-disclosure."[4] *Id.* at 605-06.

*Aguilar* stands for the principle that those who accept positions of trust involving a duty not to disclose information they lawfully acquire while performing their responsibilities have no First Amendment right to disclose that information. The question thus becomes whether, in the words of *Aguilar*, Representative McDermott's position on the Ethics Committee imposed a "special" duty on him not to disclose this tape in these circumstances. *Bartnicki* has little to say about that issue. The individuals who disclosed the tape in that case were private citizens who did not occupy positions of trust.

---

[3] The equivalent provision is currently codified at § 2232(d).

[4] *See* CODE OF CONDUCT FOR UNITED STATES JUDGES Canon 5C(8): "Information acquired by a judge in the judge's judicial capacity should not be used or disclosed by the judge in financial dealings or for any other purpose not related to the judge's judicial duties."

All members of the Ethics Committee, including Representative McDermott, were subject to Committee Rule 9, which stated that "Committee members and staff shall not disclose any evidence relating to an investigation to any person or organization outside the Committee unless authorized by the Committee."[5] This rule recognizes the unique role of the Ethics Committee and reflects a desire "to protect the rights of individuals accused of misconduct, preserve the integrity of the investigative process, and cultivate collegiality among Committee members," STAFF OF H. ETHICS REFORM TASK FORCE, 105TH CONG., REPORT OF THE ETHICS REFORM TASK FORCE ON H. RES. 168, at 10-11 (Comm. Print 1997). All members of the House of Representatives were also subject to Rule 23 of the House Rules, which stated that "[a] Member . . . shall adhere to the spirit and the letter of the Rules of the House and to the rules of duly constituted committees thereof."

The House has the power to make and enforce such rules under the Rulemaking Clause of the Constitution, which states that "Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member," U.S. CONST. art. I, § 5, cl. 2. There is no question that the rules themselves are reasonable and raise no First Amendment concerns. Counsel for Representative McDermott conceded that the House could, consistent with the First Amendment, punish Representative McDermott if it determined he had violated its rules by releasing the Martins' tape to the media.

---

[5] Under House Rule 10, clause 4(e)(3) of the 105th Congress, the special proceedings dealing with Gingrich proceeded under the rules applicable to the 104th Congress. Thus, although Representative McDermott disclosed the tape during the 105th Congress, the applicable rule was that of the 104th Congress.

If the First Amendment does not protect Representative McDermott from House disciplinary proceedings, it is hard to see why it should protect him from liability in this civil suit. Either he had a First Amendment right to disclose the tape to the media or he did not. If he had the right, neither the House nor the courts could impose sanctions on him for exercising it. If he did not have the right, he has no shield from civil liability or from discipline imposed by the House. In that event, his civil liability would rest not on his breach of some ethical duty, but on his violation of a federal statute for which he had no First Amendment defense. The situation is the same as that in *Aguilar*. There the defendant-judge was punished not for violating his ethical duty to maintain judicial secrecy, but for violating the general prohibition on disclosing investigative searches.[6]

The only remaining question is whether the tape fell within Representative McDermott's duty of confidentiality under the rules of the House and the Ethics Committee. Representative McDermott claims the tape did not fall within his duty of confidentiality because, rather than "internal Committee information," it was a "recording of a conversation among persons outside the Committee received unsolicited from other persons outside the Committee." Citing *United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995), he contends the rules are too ambiguous for the court to apply in this case. In

---

[6] The code of conduct applicable to federal judges is not judicially enforceable; its commentary states that "the Code is not designed or intended as a basis for civil liability or criminal prosecution." CODE OF CONDUCT FOR UNITED STATES JUDGES Canon 1 cmt. Nevertheless, the Supreme Court in *Aguilar* essentially took notice of the applicable standard of conduct in deciding that the defendant-judge had no First Amendment defense to criminal liability for disclosing a wiretap. *See* 515 U.S. at 605-06.

*Rostenkowski*, we noted that "the Rulemaking Clause of Article I clearly reserves to each House of the Congress the authority to make its own rules." *Id.* at 1306. When "a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the [House] itself." *Id.* Thus, "a sufficiently ambiguous House Rule is nonjusticiable." *Id.*

Here we can be confident that the rules covered Representative McDermott's handling of the tape. On December 8, 2006, the Ethics Committee adopted the report of the investigative subcommittee dealing with Representative McDermott's disclosure of the tape. The report emphasized "the unique charter of the Committee to conduct its work in a non-partisan manner, and the threat posed to the integrity of the House of even the appearance of unfairness to Members under investigation or of bias or impartiality by Members of the Committee." *In re Representative James McDermott*, H.R. REP. NO. 109-732, at 17 (2006). After discussing Committee Rule 9 and House Rule 23, among other rules, the report concluded "Representative McDermott's conduct, i.e., his disclosure to the news media of the contents of the tape furnished to him by the Martins, was inconsistent with the spirit of the applicable rules and represented a failure on his part to meet his obligations as Ranking Minority Member of the House Select Committee on Ethics." *Id.* at 16. The report said Representative McDermott should have "entrust[ed] the Committee at the outset with the information to which he alone on the Committee had access." *Id.* at 17.

We agree with and accept the Ethics Committee's interpretation of the rules as applied to this case, and thereby

eliminate the concerns mentioned in *Rostenkowski*.[7] When Representative McDermott became a member of the Ethics Committee, he voluntarily accepted a duty of confidentiality that covered his receipt and handling of the Martins' illegal recording. He therefore had no First Amendment right to disclose the tape to the media.

*Affirmed.*

---

[7] Representative McDermott makes much of the fact that the investigative subcommittee did not adopt a Statement of Alleged Violation under Committee Rule 19(f) of the Ethics Committee, but rather issued a report under Committee Rule 19(g) without recommending further disciplinary proceedings. We cannot see why this matters. The subcommittee reached conclusions adverse to Representative McDermott, finding that his disclosure of the tape not only violated the spirit of the rules but also violated "his obligations as Ranking Minority Member." *In re Representative James McDermott*, H.R. REP. NO. 109-732, at 16 (2006). The Committee ratified the subcommittee's findings, adopting the report "as the Report of the full Committee." *See* COMMITTEE ON STANDARDS OF OFFICIAL CONDUCT, SUMMARY OF ACTIVITIES, H.R. REP. NO. 109-744, pt. VII (2007). The Committee necessarily believed that it had authority to act as it did, and "the rules of a particular committee are for that committee to interpret." LEWIS DESCHLER & WILLIAM HOLMES BROWN, PROCEDURE IN THE U.S. HOUSE OF REPRESENTATIVES, 97TH CONGRESS, ch. 17 § 11.1 (4th ed. 1982).

GRIFFITH, *Circuit Judge*, concurring: Although I agree that Representative McDermott's actions were not protected by the First Amendment and for that reason join Judge Randolph's opinion, I write separately to explain that I would have found the disclosure of the tape recording protected by the First Amendment under *Bartnicki v. Vopper*, 532 U.S. 514 (2001), had it not also been a violation of House Ethics Committee Rule 9, which imposed on Representative McDermott a duty not to "disclose any evidence relating to an investigation to any person or organization outside the Committee unless authorized by the Committee." Although the Court does not and need not reach the *Bartnicki* issue to resolve the matter before us, two previous panels in this case have held that the congressman's actions were not protected by the First Amendment. I believe it is worth noting that a majority of the members of the Court—those who join Part I of Judge Sentelle's dissent—would have found his actions protected by the First Amendment. Nonetheless, because Representative McDermott cannot here wield the First Amendment shield that he voluntarily relinquished as a member of the Ethics Committee, I join Judge Randolph's opinion in concluding that his disclosure of the tape recording was not protected by the First Amendment.

SENTELLE, *Circuit Judge*, *dissenting*, with whom *Circuit Judges* ROGERS, TATEL, and GARLAND join, and with whom *Circuit Judge* GRIFFITH joins as to Part I: The history of this case is by now quite long, and most of it is set out either in the majority opinion or in one of the previous iterations of the underlying events and the court decisions set forth in prior opinions of this court. *See Boehner v. McDermott*, 191 F.3d 463 (D.C. Cir. 1999) ("*Boehner D.C. Cir. I*"); *Boehner v. McDermott*, 441 F.3d 1010 (D.C. Cir. 2006) ("*Boehner D.C. Cir. II*"). Appellee brought the present action, which the district court dismissed, reasoning this application of 18 U.S.C. § 2511(1)(c) violated the First Amendment guarantee to the right of free speech. The defendant appealed. In a split decision, a panel of this court reversed the dismissal, holding that the application of section 2511(1)(c) and a parallel Florida statute "are not unconstitutional as applied in this case." *Boehner D.C. Cir. I*, 191 F.3d at 478; *see also id.* at 480 (Ginsburg, J., concurring). I disagreed with the majority's opinion then, as I do today. As I perceived the case then, and as we perceive it now, the issue is: "Where the punished publisher of information has obtained the information in question in a manner lawful in itself but from a source who has obtained it unlawfully, may the government punish the ensuing publication of that information based on the defect in a chain?" *Id.* at 484-85 (Sentelle, J., dissenting) (quoted in *Bartnicki v. Vopper*, 532 U.S. 514, 528 (2001)). We would have answered that question in the negative. Today I reach that conclusion with confidence, based on the Supreme Court's decision adjudicating the constitutionality of a similar application of this same analysis in *Bartnicki*.

At approximately the same time that our prior decision was making its way to the Supreme Court, the Court granted *certiorari* in *Bartnicki v. Vopper*, 200 F.3d 109 (3d Cir. 1999), to answer precisely the issue before us in *Boehner*. *See Bartnicki v. Vopper*, 530 U.S. 1260 (2000) (granting *certiorari*).

In *Bartnicki*, the Third Circuit had concluded that the application of 18 U.S.C. § 2511(1)(c) to prevent disclosure of information obtained by the disclosing person from a tape of unlawfully intercepted communications was constitutionally "invalid" because it "deterred significantly more speech than necessary to protect the privacy interests at stake." 532 U.S. at 522. The Supreme Court expressly granted *certiorari* "to resolve the conflict," between *Bartnicki* and our decision in *Boehner D.C. Cir. I. Id.* The Court affirmed the decision of the Third Circuit, *id.* at 535, and thereby resolved the conflict in favor of the Third Circuit's decision, not our decision in *Boehner*.

Thereafter, in the wake of *Bartnicki*, the Supreme Court vacated our prior decision in *Boehner D.C. Cir. I* and remanded to this court for further consideration in light of *Bartnicki*. 532 U.S. 1050 (2001). We remanded the matter to the district court. That court entered a new decision in favor of appellee. *Boehner v. McDermott*, 332 F. Supp. 2d 149 (D.D.C. 2004). McDermott then appealed. A panel of this court reheard the matter and affirmed the district court, again over my dissent. *Boehner D.C. Cir. II*, 441 F.3d 1010. We vacated the panel and set the matter for the present en banc proceeding. On the issue considered by the Supreme Court in *Bartnicki*, the position of the dissent in the prior panel opinions now commands a majority of the court so that Section I of this opinion speaks for the court. However, because of the majority decision as to the *Bartnicki* issue, the court found it necessary to reach a second issue not previously fully considered. As that issue became the rule of decision, and resulted in an affirmance of the district court; and as a majority of the court has now decided to affirm the district court on the basis of the second issue, discussed in Section II of this separate opinion, that portion of this opinion will speak only for a dissenting minority of the court.

3

I.

As to the issue dealt with in the prior opinions, speaking now for a majority of the court, we determine that *Bartnicki* is controlling and that the *Bartnicki* reasoning of the Supreme Court compels a conclusion that the district court incorrectly concluded that *Bartnicki* does not apply.

In *Bartnicki*, the chief negotiator for a Union Local, which was then engaged in negotiations on behalf of teachers with a local school board, used a cellular phone to call the president of the Union "and engage in a lengthy conversation about the status of the negotiations." 532 U.S. at 518. At one point in the conversation, referring to the school board's "intransigence," she said "'we're gonna have to go to their . . . homes . . . [t]o blow off their front porches . . . .'" *Id.* at 518-19. A local radio commentator, respondent in the Supreme Court, broadcast a tape of the conversation on a radio show. All parties agreed that the tape, like the tape of Boehner's conversation released by McDermott, was the result of an unlawful interception. The identity of the interceptor remained undisclosed throughout the litigation. The Union officers, like Boehner in the instant case, sued the publishers of the contents of the tape. The defendants included the broadcaster, the radio stations over which he made his broadcast, and the person who furnished the broadcaster with the tape, himself the head of a local citizens' group who testified that he had obtained the tape when it was left anonymously in his mailbox. Like Boehner in the case before us, plaintiffs relied on section 2511(1)(c) and a state statute of similar import. The district court granted summary judgment for the plaintiffs, rejecting the defendants' First Amendment defense. As noted above, the Third Circuit, in a divided opinion, disagreed, reversed the trial court, and remanded with directions to the district court to grant the summary judgment motions of the defendants on the basis of the First Amendment defense.

*Bartnicki*, 200 F.3d at 129.

On *certiorari* the Supreme Court, as had the Third Circuit, ruled that the statute was content neutral and subjected the statute to review under the "intermediate scrutiny" standard. 532 U.S. at 521, 526. Applying that standard, the Supreme Court held that the statute was unconstitutional as applied.

In addressing the issue, the Supreme Court adopted my formulation:

Where the punished publisher of information has obtained the information in question in a manner lawful in itself but from a source who has obtained it unlawfully, may the government punish the ensuing publication of that information based on the defect in a chain?

*Id.* at 528 (quoting *Boehner D.C. Cir. I*, 191 F.3d at 484-85) (internal quotation marks omitted) (Sentelle, J., dissenting)). In analyzing the law on that subject, the Supreme Court first noted that "[a]s a general matter, 'state action to punish the publication of truthful information seldom can satisfy constitutional standards.'" *Id.* at 527 (quoting *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979)). The Supreme Court then expressed its continuing belief "that the sensitivity and significance of the interests presented in clashes between [the] First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case." *Id.* at 529 (quoting *Florida Star v. B.J.F.*, 491 U.S. 524, 532-33 (1989)) (alteration in original). In applying that balance to the facts before it, the Court observed that the United States, appearing in the case to defend the constitutionality of the statute, had identified "two interests served by the statute." *Id.* The first of those interests was the removal of "an incentive for parties to intercept private

conversations," and the second, to "minimiz[e] the harm to persons whose conversations have been illegally intercepted." *Id.* While the Court was willing to "assume that those interests adequately justify the prohibition in § 2511(1)(d) against the interceptor's own use of information . . . acquired by violating § 2511(1)(a)," the Court explicitly stated that "it by no means follows that punishing disclosures of lawfully obtained information of public interest by one not involved in the initial illegality is an acceptable means of serving those ends." *Id.*

The Court easily dispensed with the first justification, opining that "[t]he normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it." *Id.* The Court concluded, however, that "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." *Id.* at 529-30. It further noted that "there is no basis for assuming that imposing sanctions" on the communicating possessor of conversations illegally taped by another "will deter the unidentified scanner from continuing to engage in surreptitious interceptions." *Id.* at 531. Thus, the Court held that "the Government's first suggested justification for applying § 2511(1)(c) to an otherwise innocent disclosure of public information is plainly insufficient." *Id.* at 532.

However, the Court found the government's second justification, that is, the protection of privacy, "considerably stronger." *Id.* It noted the importance of privacy of communication and the legitimacy of the argument that "fear of public disclosure of private conversations might well have a chilling effect on private speech." *Id.* at 533. Nonetheless, the Court was convinced that the enforcement of section 2511(1)(c) on the facts before it, "implicat[ed] the core purposes of the First Amendment because it imposes sanctions on the publication of

truthful information of public concern." *Id.* at 533-34. In concluding that this second interest did not have sufficient strength to warrant the limitation on publication of truthful information of public concern, the Court reiterated the classic principle that "'[t]he right of privacy does not prohibit any publication of matter which is of public or general interest.'" *Id.* at 534 (quoting Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193, 214 (1890)).

In the light of the Supreme Court's resolution of the conflict between our *Boehner* decision and the Third Circuit's decision in *Bartnicki*, there is no justification for us to hold otherwise on the facts before us. There is no distinction of legal, let alone constitutional, significance between our facts and those before the Court in *Bartnicki*. As the panel majority in *Boehner D.C. Cir. II* admitted, "[t]he *Bartnicki* Court held that under the First Amendment, § 2511(1)(c) was invalid as applied to individuals who lawfully obtained a tape of such a conversation and then disclosed it." 441 F.3d at 1013. That said, appellee is unable to produce a material distinction between this case and *Bartnicki*. Granted, the panel majority stated:

> The difference between this case and *Bartnicki* is plain to see. It is the difference between someone who discovers a bag containing a diamond ring on the sidewalk and someone who accepts the same bag from a thief, knowing the ring inside to have been stolen. The former has committed no offense; the latter is guilty of receiving stolen property, even if the ring was intended only as a gift.

*Id.* at 1017 (footnote omitted). In fact, the difference is not plain at all. In *Bartnicki* the Supreme Court expressly stated:

> The suit at hand involves the repeated intentional disclosure of an illegally intercepted cellular telephone conversation about a public issue. The persons who made the disclosures did not participate in the interception, but they did know--or at least had reason to know--that the interception was unlawful.

532 U.S. at 517-18. The panel majority apparently made a distinction between the two cases based on an analogy between a person who buys a diamond ring from a thief, and one who obtains a stolen diamond ring knowing it to be stolen or having at least good reason to know that it was stolen. We see no such distinction, let alone a plain one of constitutional significance. The Supreme Court underlined the lack of constitutional significance of the communicator's knowledge that the interception had been unlawfully conducted. It stated that "[w]e accept petitioners' submission that the interception was intentional, and therefore unlawful, and that, at a minimum, respondents 'had reason to know' that it was unlawful." *Id.* at 525. The panel majority, apparently attempting to shore up its distinction, stated:

> As Chief Judge Ginsburg wrote in the original appeal: "One who obtains information in an illegal transaction, with full knowledge the transaction is illegal, has not 'lawfully obtain[ed]' that information in any meaningful sense."

*Boehner D.C. Cir. II*, 441 F.3d at 1017 n.6 (quoting *Boehner D.C. Cir. I*, 191 F.3d at 479 (Ginsburg, J., concurring)) (alteration in original).

The Supreme Court has directly dispelled that notion both in *Bartnicki* itself and previously. The Court in *Bartnicki* expressly stated, "[respondents'] access to the information on the tapes was obtained lawfully, even though the information itself was intercepted unlawfully by someone else." 532 U.S. at 525. In support of this proposition the court cited and quoted *Florida Star*, which stated "[e]ven assuming the Constitution permitted a State to proscribe *receipt* of information, Florida has not taken this step." 491 U.S. at 536 (emphasis in original). Florida still has not taken that step, nor has Congress. Therefore, the otherwise-lawful receipt of unlawfully obtained information remains in itself lawful, even where the receiver knows or has reason to know that the source has obtained the information unlawfully.

Even less convincing is the *Boehner D.C. Cir. II* panel majority's assertion that the Court mentioned the anonymity of the interceptor in *Bartnicki* several times and "distinguished this case on that ground." 441 F.3d at 1015. The asserted distinguishing of this case occurred in a footnote stating as follows:

> In the *Boehner* case, as in this suit, a conversation over a car cell phone was intercepted, but in that case the defendant knew both who was responsible for intercepting the conversation and how they had done it. In the opinion of the majority [of the D.C. Circuit], the defendant acted unlawfully in accepting the tape in order to provide it to the media.

532 U.S. at 522 n.5 (quoted at 441 F.3d at 1014) (internal citations omitted). The panel majority hastened to say "[w]e do not want to read too much into the Court's 'but' in the first sentence, yet one must wonder why the Court drew this distinction if it meant to adopt the rule Representative

McDermott urges on us." 441 F.3d at 1014. The referenced footnote occurs in the Court's statement of the facts of the case and is never referenced in the legal analysis. Indeed, the footnote is subscribed to a textual sentence stating "[i]n so doing, [the Third Circuit dissenter] agreed with the majority opinion in a similar case decided by the Court of Appeals for the District of Columbia, *Boehner v. McDermott*, 191 F.3d 463 (D.C. Cir. 1999)." 532 U.S. at 522. If the Supreme Court in fact thought that the "distinction" was of constitutional significance, one must wonder why it thought the different results in the two circuit cases constituted a disagreement. This wonderment must be greatly enhanced upon reading the next sentence, which states, "[w]e granted certiorari to resolve the conflict." *Id.* The Supreme Court then goes on to resolve the conflict without making any further mention of any factual difference between the cases. To paraphrase the *Boehner D.C. Cir. II* panel majority, one must wonder why the Court so easily dispensed with the distinction between one who knows who unlawfully intercepted a conversation and one who knows or has reason to know it was unlawfully intercepted. Indeed, the Supreme Court's disposition of the case lays to rest any distinction even between the one who knows and the one who has reason to know. The Court reversed and remanded, directing entry of judgment for the defense on the constitutional theory. The record before the Court did not establish whether the defendants knew or only had reason to know of the unlawful obtaining of the conversations. If there were any such distinction in the High Court's view, the disposition would have been a vacatur and remand for the lower courts to establish upon which side of the "distinction" their case fell – that is, to determine whether the respondents knew or only had reason to know. As the Court made no such disposition, there is plainly no such distinction of constitutional magnitude.

The Supreme Court has decided the first issue of this case, that is, whether the United States (or Florida) can constitutionally bar the publication of information originally obtained by unlawful interception but otherwise lawfully received by the communicator, in the negative. We venture to say that an opposite rule would be fraught with danger. Just as Representative McDermott knew that the information had been unlawfully intercepted, so did the newspapers to whom he passed the information. Representative Boehner has suggested no distinction between the constitutionality of regulating communication of the contents of the tape by McDermott or by *The Washington Post* or *The New York Times* or any other media resource. For that matter, every reader of the information in the newspapers also learned that it had been obtained by unlawful intercept. Under the rule proposed by Representative Boehner, no one in the United States could communicate on this topic of public interest because of the defect in the chain of title. We do not believe the First Amendment permits this interdiction of public information either at the stage of the newspaper-reading public, of the newspaper-publishing communicators, or at the stage of Representative McDermott's disclosure to the news media. Lest someone draw a distinction between the First Amendment rights of the press and the First Amendment speech rights of nonprofessional communicators, we would note that one of the communicators in *Bartnicki* was himself a news commentator, and the Supreme Court placed no reliance on that fact.

Therefore, as to the first issue, we now determine that the district court decision in favor of Boehner was incorrect as to this issue.

11

## II.

### A.

Notwithstanding the majority's view that the district court was incorrect as to the *Bartnicki* issue, the en banc court now holds that the judgment in favor of Boehner will be upheld on a ground different than that relied upon by the district court, arising from an issue not addressed in the previous majority opinions of this court. Boehner's argument, accepted as the basis of the majority's holding that the district court should be affirmed, is that McDermott's speech was not entitled to the First Amendment protection recognized in *Bartnicki* and the cases upon which it relies, but not because the First Amendment provides no protection against the imposition of liability under 18 U.S.C. § 2511(1)(c) to the receiver of information unlawfully obtained by the transferor of the information. Rather, Boehner argues, the protections of the First Amendment are not available in an action under § 2511(1)(c) to a public official whose First Amendment rights are otherwise limited by a body of rules unrelated to that statute. More specifically, Boehner advances an argument, which the majority accepts, that starts from the undisputed factual proposition that McDermott, as a member of the Ethics Committee of the United States House of Representatives, was subject to Committee Rule 9. That rule stated that "Committee members and staff shall not disclose any evidence relating to an investigation to any person or organization outside the Committee unless authorized by the Committee." Boehner reasons, and the majority now agrees, that because McDermott's speech was otherwise limited in this fashion by the rules, he was not afforded the First Amendment protection recognized in *Bartnicki* against liability for disclosure under the wiretap statutes of the United States and Florida. I find this reasoning to be a *non sequitur*.

The majority relies on such cases as *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562 (1977), for the proposition that the Supreme Court has sustained restrictions on disclosure of information even though the information was lawfully obtained. Maj. Op. at 9. It is true that in *Zacchini* the Supreme Court recognized the right of a performer to recover for the economic loss caused by the uncompensated broadcast of his performance under the state law tort of infringement of the performer's "right of publicity." By no means, though, did the Court in *Zacchini* hold that its conclusion that the First Amendment did not protect the broadcaster against that cause of action deprived it of First Amendment protection in all circumstances and under all theories of law related to its possible broadcast of performances. Indeed, the *Zacchini* Court expressly stated:

> It is evident, and there is no claim here to the contrary, that petitioner's state-law right of publicity would not serve to prevent respondent from reporting the newsworthy facts about petitioner's act.

433 U.S. at 574 (footnote omitted). As Justice Powell noted in dissent,

> The holding today is summed up in one sentence: "Wherever the line in particular situations is to be drawn between media reports that are protected and those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent."

*Id.* at 579 (Powell, J., dissenting) (quoting *id.* at 574-75). Indeed, the *Zacchini* Court was at pains to note that "[p]etitioner does not seek to enjoin the broadcast of his performance; he simply wants to be paid for it." *Id.* at 578.

In short, *Zacchini* is not analogous to the case at bar. It would perhaps be analogous were we passing on the authority of the congressional committee to enforce its rule against McDermott in the face of a First Amendment claim, but that is not our case.

Likewise, the majority's reliance on *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), is misplaced. That case holds no more than that a person with whom a newspaper has made a contract not to publish certain information may recover damages when the defendant has breached that contract. The opinion in *Cohen*, while short and narrow, nonetheless distinguishes a contract claim from, for example, an action for libel or defamation:

> Nor is Cohen attempting to use a promissory estoppel cause of action to avoid the strict requirements for establishing a libel or defamation claim. . . . Cohen could not sue for defamation because the information disclosed [his name] was true.

*Id.* at 671 (internal citations and punctuation omitted). Thus, the Court expressly distinguished the *Cohen* facts from *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), wherein the Court had "held that the constitutional libel standards apply to a claim alleging that the publication of a parody was a state-law tort of intentional infliction of emotional distress." *Cohen*, 501 U.S. at 671.

Again, the *Cohen* Court by no means held that the recognition of one limitation on First Amendment protection of a particular communication rendered the First Amendment inapplicable to that communication for other purposes. Just so today. It may well be that the Committee's rule constitutes a valid limitation on McDermott's speech. For reasons set forth

below, that is by no means clear to me.  It is clear that even if that is the case, the rule cannot deprive the speech of all First Amendment protection.

The majority further relies on *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984).  That case stands for nothing more than the proposition that

> where a protective order is entered on a showing of good cause as required by Rule 26(c), is limited to the context of pretrial civil discovery, and does not restrict the dissemination of the information if gained from other sources, it does not offend the First Amendment.

*Id.* at 37 (footnote omitted).  That holding simply has no application to the case before us.

Finally, the majority places strongest reliance on *United States v. Aguilar*, 515 U.S. 593 (1995), a case it describes as "closely analogous to this one."  Maj. Op. at 10.  I can do little to improve on the majority's description of that case, which upheld the restriction of the disclosure of a confidential wiretap as applied to a federal district judge.  Like the other cases discussed above, that holding is not on point for the issue before us.  First, although it is true that the Court relied in part on the "special duties of nondisclosure" associated with Aguilar's position as a federal judge, the Court also stressed the fact that the statute at issue there did "not impose such a restriction [on disclosure] generally, but only upon those who disclose wiretap information 'in order to obstruct, impede, or prevent' the interception."  *United States v. Aguilar*, 515 U.S. 593, 605 (1995) (quoting 18 U.S.C. § 2232(c) (current version at 18 U.S.C. § 2511(1)(c))), so at least one ground of the *Aguilar* decision has no application here.  Second, we are not charged today with deciding the validity of the restriction placed on

McDermott's speech by the House Committee rule. If we were, then perhaps this would be an analogous case governed by *Aguilar*. The statute at issue in *Aguilar* was closely connected with the "special duty of nondisclosure" that limited the defendant's First Amendment rights. The Supreme Court concluded that a "Federal District Court Judge who learned of a confidential wiretap application from the judge who had authorized the interception, and who wished to preserve the integrity of the court," *Aguilar*, 515 U.S. at 606, had no First Amendment defense against a statute prohibiting "the disclosure of information that a wiretap has been sought or authorized," *id.* at 602. It does not follow that Representative McDermott's violation of a House Committee rule deprives him of a First Amendment defense to every other nondisclosure law, including § 2511(c) – which in this case is unrelated to whatever "special duty of nondisclosure" McDermott may have had as a member of Congress. Rather, we are charged with determining the constitutionality of applying § 2511 in circumstances directly paralleling those considered by the Supreme Court in *Bartnicki*. The Court in *Bartnicki* upheld the constitutional protection of the possessor of information originally obtained through an unlawful eavesdropping by another. *Aguilar* in no way speaks to that question.

Again, were we considering the validity of the Committee's rule as applied to McDermott's conduct, the cases relied upon by the majority would be instructive – perhaps compelling. But we are not. If the House Committee rules created a private right of action – a most dubious possibility – those cases would be instructive. But neither of those theories is before us. We are reviewing a case governed by *Bartnicki*, and *Bartnicki*'s holding should prevail. Under that holding, we should reverse the decision of the district court and order this case dismissed.

16

B.

I note that the district court declined to apply *Aguilar* on the theory that "it is outside the realm of the courts to construe Congressional rules that present significant ambiguities." *Boehner v. McDermott*, 332 F. Supp. 2d 149, 162 (D.D.C. 2004). I fully agree. As the district court noted, *United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995), "permits [the courts] to take limited judicial cognizance of the [Ethics Committee Rules]." *Boehner v. McDermott*, 332 F. Supp. 2d 149, 162 (D.D.C. 2004). However, as the district court further noted, *Rostenkowski* also "makes clear that it is outside the realm of the courts to construe Congressional rules that present significant ambiguities." *Id.* (citing 59 F.3d at 1312). Again, I fully agree. The *Rostenkowski* Court correctly stated, as the district court noted, that the courts "cannot presume to interpret [the rule]" of a House of Congress when that rule contains ambiguity. *See id.* We must leave for the coordinate branch of government the interpretation of its own rules. Committee Rule 9 states that "Committee members and staff shall not disclose any evidence relating to an investigation to any person or organization outside the Committee unless authorized by the Committee." *See* Maj. Op. at 11. From the face of the rule, it is hardly unambiguous that the rule forbids disclosure of information obtained by a member – such as McDermott – from private citizens such as the Martins. The tape in question had never become the possession of the Committee, although the Martins may well have intended that it do so. Nor is it by any means pellucid that the tape was "evidence related to an investigation" within the meaning of the rule at the time the Martins turned it over to McDermott. The release by McDermott was not in violation of an unambiguous rule.

Neither can I subscribe to the majority's confidence that the Ethics Committee's Report on McDermott's conduct removes all ambiguity. As the majority notes, the Committee ruled only that "his disclosure . . . was inconsistent with the spirit of the applicable rules and represented a failure on his part to meet his obligations as Ranking Minority Member of the House Select Committee on Ethics." *See* Maj. Op. at 13. The very incorporation of the phrase "inconsistent with the *spirit of the applicable rules*" would seem to defeat a claim that the Committee had determined that the rules unambiguously applied to his conduct.

To the extent the court holds that Representative McDermott forfeited his First Amendment protection either by conducting himself inconsistently with the "spirit" of Rule 9 or by violating the terms of House Rule 23—which states that "[a] Member . . . shall adhere to the spirit and the letter of the Rules of the House and to the rules of duly constituted committees thereof"—its holding suffers from a separate defect. Abrogating Representative McDermott's First Amendment protections because he violated the "spirit" of a rule contravenes the well-established principle that vague restrictions on speech are impermissible because of their chilling effect, *see Reno v. ACLU*, 521 U.S. 844, 871-72 (1997), and because of "the need to eliminate the impermissible risk of discriminatory enforcement," *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051 (1991). Plainly, subjecting a Member of Congress to liability for violating the "spirit" of a rule burdens political speech in the vaguest of ways, leaving the Member to "guess at [the] contours" of the prohibition. *Id.* at 1048. Nothing in *Aguilar* countenances such a result.

For the reasons set forth above, I respectfully dissent.